30

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTH

**UNITED STATES OF AMERICA,**

Case:2:12-cr-20030
Judge: Tarnow, Arthur J.
MJ: Michelson, Laurie J.
Filed: 01-18-2012 At 01:18 PM
SEALED MATTER: USA V. SEALED MATTER
(KB)

vs.

**VIOLATIONS:**

**D-1    JEFFREY BEASLEY,**

18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 1346
18 U.S.C. § 1349
18 U.S.C. § 1951

**Defendant.**
_____/

## INDICTMENT

The Grand Jury Charges that:

D-1    **JEFFREY BEASLEY**

## INTRODUCTION

From approximately January 2006 through September 2008:

1. **JEFFREY BEASLEY** was a public official for the City of Detroit, Michigan, that is, the Treasurer of the City of Detroit.  In addition, **JEFFREY BEASLEY** was a Trustee of the General Retirement System and the Police and Fire Retirement System of the City of Detroit by virtue of his position as City Treasurer.  **JEFFREY BEASLEY** was appointed as City Treasurer by, and served at the pleasure of, the Mayor of the City of Detroit.

2. Kwame Kilpatrick was the Mayor of the City of Detroit.  In addition, Kwame Kilpatrick was a Trustee of the General Retirement System and the Police and Fire

Retirement System of the City of Detroit by virtue of his position as Mayor. Kwame Kilpatrick controlled the Kilpatrick Civic Fund, a purported non-profit entity.

3. The City of Detroit, Michigan maintained two pension funds for its employees: the General Retirement System and the Police and Fire Retirement System (collectively the "Retirement Systems"). These pension funds were overseen by Boards of Trustees. The Trustees were obligated by law to act in good faith to best protect the interests of the retirees and beneficiaries.

4. The General Retirement System of the City of Detroit provided pension and related benefits to retired City of Detroit employees and other beneficiaries, such as surviving spouses, covered by the System's plan. The General Retirement System maintained trust funds consisting of contributions and earnings from those contributions. Funds from the General Retirement System were used to pay benefits to retirees and beneficiaries, as well as to pay the expenses of the System. As of June 30, 2008, the General Retirement System had 8,823 active members and 11,388 retirees and beneficiaries.

5. The General Retirement System was governed by a ten-member Board of Trustees. Six of the Trustees were elected, and one Trustee was selected by the Mayor as a citizen representative. In addition, the Board had three *ex-officio* members, including the City Treasurer, the Mayor, and a member of the City Council selected by the City Council. It was the practice of the Mayor to designate a representative when he was absent to sit in his place, with full voting power. The Board of Trustees met on a weekly

-2-

basis, making investment and other decisions based on a majority of those present and voting.

6. The Police and Fire Retirement System of the City of Detroit provided pension and related benefits to retired City of Detroit employees who were police officers or fire fighters, and other beneficiaries, such as surviving spouses, covered by the System's plan. The Police and Fire Retirement System maintained trust funds consisting of contributions and earnings from those contributions. Funds from the Police and Fire Retirement System were used to pay benefits to retirees and beneficiaries, as well as to pay the expenses of the System. As of June 30, 2008, the Police and Fire Retirement System had 4,078 active members and 8,442 retirees and beneficiaries.

7. The Police and Fire Retirement System was governed by an eleven-member Board of Trustees. Six of the Trustees were elected. In addition, the Board had five *ex-officio* members, including the City Treasurer, the Mayor, the Fire Commissioner, the Chief of Police, and a member of the City Council selected by the City Council. It was the practice of the Mayor, the Chief of Police, and the Fire Commissioner to designate a representative to sit in their place when they were absent, with full voting power. The Board of Trustees met on a weekly basis, making investment and other decisions based on a majority of those present and voting.

8. As Treasurer for the City of Detroit, **JEFFREY BEASLEY** was an *ex officio* Trustee of the General Retirement System Board of Trustees and the Police and Fire Retirement System Board of Trustees. **JEFFREY BEASLEY** and all Trustees were

-3-

prohibited by state law from dealing with the assets of the General Retirement System and the Police and Fire Retirement System in their own interest or from receiving any consideration for their own personal accounts from any party dealing with General Retirement System assets or Police and Fire Retirement System assets, as required by the Public Employee Retirement System Investment Act, M.C.L. § 38.1133(7). **JEFFREY BEASLEY** and all Trustees were also required by state law to discharge their duties solely in the interest of the General Retirement System and Police and Fire Retirement System participants and beneficiaries, including making investments for the exclusive purpose of providing benefits to the participants and beneficiaries of Detroit's two Retirement Systems. M.C.L. § 38.1133(3).

9. Michigan law prohibits public officials, such as **JEFFREY BEASLEY**, from accepting bribes. M.C.L. § 750.118.

10. All dates in this Indictment are alleged to have occurred on or about the stated dates.

## COUNT 1

### (Conspiracy to Commit Honest Services Mail and Wire Fraud
### 18 U.S.C. § 1349)

1. The allegations contained in paragraphs 1–10 of the Introduction of this Indictment are realleged and incorporated by reference in this Count 1. From approximately January 2006 to September 2008, in the Eastern District of Michigan, Southern Division, and elsewhere, the defendant, **JEFFREY BEASLEY**, did unlawfully

and knowingly conspire and agree with other persons, known and unknown, to:

(A) Commit honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346; and

(B) Commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

### THE SCHEME TO DEFRAUD

2. From approximately January 2006 to September 2008, in the Eastern District of Michigan, Southern Division, and elsewhere, the defendant, **JEFFREY BEASLEY**, conspired with others to devise a scheme to defraud present and retired employees of the City of Detroit who contributed to the General Retirement System and the Police and Fire Retirement System of their right to the honest, faithful, and impartial services of **JEFFREY BEASLEY**, including their right to his conscientious, loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, bribery, fraud, and corruption, and to (1) cause matters and things to be placed in any post office and authorized depository to be sent and delivered by the Postal Service, (2) cause matters to be delivered by commercial interstate carrier according to the direction thereon, and (3) cause writings, signals, and sounds to be transmitted by wire in interstate and foreign commerce, for the purpose of executing and attempting to execute the scheme and artifice, as set forth below.

-5-

## OBJECTS OF THE SCHEME TO DEFRAUD

3. It was an object of the scheme to defraud the employees and retirees of the City of Detroit that **JEFFREY BEASLEY** used his position as a Trustee of the Retirement Systems to personally enrich himself and other co-conspirators by demanding or accepting bribes and kickbacks in the form of cash, travel, meals, golf clubs, drinks, gambling money, hotel stays, entertainment, Las Vegas concert tickets, massages, limousine service, private plane flights, and other things of value from persons who dealt with the Retirement Systems which acted on their proposals or requests. **JEFFREY BEASLEY** and his co-conspirators concealed and did not disclose these bribes and kickbacks.

4. It was a further object of the scheme to defraud that **JEFFREY BEASLEY** pressured persons who dealt with the Retirement Systems to contribute money to the Kilpatrick Civic Fund in return for his support of their requests or proposals to the Retirement Systems.

## METHODS OF ACCOMPLISHING THE SCHEME TO DEFRAUD

5. To achieve the objects of the scheme to defraud, the defendant, **JEFFREY BEASLEY**, and his co-conspirators participated in various transactions and activities, which included, but are not limited to, the following:

### *COMPANY A*

6. In approximately 2007, the General Retirement System and the Police and Fire Retirement System were each presented with investment proposals by *Company A* which provided for the Retirement Systems to give a total of approximately $44 million in

financing for *Company B*, $22 million from the General Retirement System and $22 million from the Police and Fire Retirement System. Under the proposals, the two Retirement Systems would provide this money in order to purchase five *Company B* parts warehouses. The warehouses would then be leased back to *Company B*. The proposed owner of the warehouses, the *Company A Fund*, was represented by a principal of *Company A*. The principal of *Company A* was a person who was an owner of the company and the primary beneficiary of the profits that *Company A* would earn by obtaining the funding of approximately $44 million from the two Retirement Systems.

7. In approximately August 2007, at a restaurant in Detroit, **JEFFREY BEASLEY** demanded $250,000 from the principal of *Company A* in exchange for **BEASLEY's** support of *Company A's* proposals before both Retirement Systems. The principal of *Company A* agreed to pay **JEFFREY BEASLEY** the $250,000. During the course of the conspiracy, the principal of *Company A* made payments to **JEFFREY BEASLEY** amounting to approximately $70,000 in cash. The principal of *Company A* paid this money to **JEFFREY BEASLEY** in order to secure his support for *Company A's* investment proposals to the two Retirement Systems. Ultimately, *Company A's* principal discontinued payments on the entire amount demanded because **JEFFREY BEASLEY** left office as City Treasurer and Trustee in September 2008, following the resignation of Kwame Kilpatrick.

8. On September 19, 2007, the General Retirement System passed a resolution that the System would invest $22 million with *Company A* on the condition that the General

Retirement System receive a more favorable rate of return on its investment than previously proposed by *Company A*, and that the fees that would go to *Company A* would be significantly lower than what *Company A* had previously proposed. **JEFFREY BEASLEY** was not present for the meeting at which this resolution was passed.

9.   The principal of *Company A* was upset by the action taken by the General Retirement System on September 19, 2007 because the resolution passed by the Board of Trustees would result in a far lower profit to *Company A*.  On the evening of September 19, 2007, the principal expressed his concern to **JEFFREY BEASLEY,** and he asked **JEFFREY BEASLEY** to intervene with the Retirement Systems on his behalf to change the result.  *Company A's* principal believed that **JEFFREY BEASLEY** would intervene on his behalf because the principal had agreed to pay **BEASLEY** the $250,000 that he had demanded.  **JEFFREY BEASLEY** assured *Company A's* principal that he would resolve the problem.

10.   On the evening of September 19, 2007, *Company A's* principal spoke to Kwame Kilpatrick by telephone.  The principal again expressed his concern regarding the unfavorable resolution passed by the General Retirement System.  Kwame Kilpatrick assured the principal that he would take care of the problem.

11.   On September 20, 2007, the Police and Fire Retirement System, with **JEFFREY BEASLEY** in attendance, addressed the request by *Company A* for the other $22 million in investment money from that System.  The Board of Trustees was presented with eight investment scenarios, each with a different rate of return for the System and each with a

different fee structure for *Company A*. At the direction of **JEFFREY BEASLEY**, one of the Trustees moved that the Board approve the investment scenario desired by the principal of *Company A*. This scenario was the least beneficial for the Police and Fire Retirement System because it required the lowest rate of return for the System from *Company A*. In addition, this scenario was the most beneficial scenario for *Company A* because it provided for the highest management fees. **JEFFREY BEASLEY** voted in favor of this proposal, and the motion passed. Four Trustees voted against the proposal.

12. At the September 26, 2007 meeting of the General Retirement System, with **JEFFREY BEASLEY** in attendance, the Trustees amended their September 19, 2007 resolution regarding the $22 million investment in the *Company A* deal so that *Company A* was given the same favorable terms as were given by the Police and Fire Retirement System. **JEFFREY BEASLEY** voted in favor of this deal, which was the most beneficial to *Company A* and the least favorable to the Retirement System.

13. On multiple occasions during the course of the conspiracy, the principal of *Company A* paid for hotel rooms at the Atheneum Hotel for use by **JEFFREY BEAS- LEY** and his paramour.

14. In approximately March 2008, the principal of *Company A* paid for a vacation in Miami Beach, Florida for **JEFFREY BEASLEY** and his paramour, including the costs of the plane flight, hotel stay, meals, and other expenses.

15. Subsequent to the approval of the $44 million investments by the two Retirement Systems, *Company A* received millions of dollars in management and other

fees from the Retirement Systems.

## KILPATRICK CIVIC FUND

16.  While Treasurer of the City of Detroit and Trustee of the General Retirement System and the Police and Fire Retirement System, **JEFFREY BEASLEY** actively solicited donations to the Kilpatrick Civic Fund from persons and businesses who dealt with the two Retirement Systems.

17.  **JEFFREY BEASLEY** told persons and businesses who dealt with the two Retirement Systems that they would receive favorable treatment from the Retirement Systems if they donated to the Kilpatrick Civic Fund.  Numerous persons and businesses solicited by **JEFFREY BEASLEY** donated to the Kilpatrick Civic Fund with the hope of receiving favorable treatment for their investment proposals by the Retirement Systems. Over the course of the conspiracy, **JEFFREY BEASLEY** and other members of the conspiracy voted in favor of  investment proposals of persons and businesses because the person or business had donated or would donate to the Kilpatrick Civic Fund.  During the course of the conspiracy, **JEFFREY BEASLEY** was paid an annual salary of approximately $120,000 as City Treasurer.  **JEFFREY BEASLEY's** work in soliciting and obtaining donations to the Kilpatrick Civic Fund enhanced **BEASLEY's** position as Treasurer with Mayor Kwame Kilpatrick, at whose pleasure **BEASLEY** served, so that **BEASLEY** continued to serve as Trustee of both Retirement Systems, where he wielded power over people and businesses seeking investment money from the Systems by virtue of his position.  Examples of some of the persons and businesses that gave money to the

-10-

Kilpatrick Civic Fund and received favorable treatment from **JEFFREY BEASLEY** and the Retirements Systems include, but are not limited to, the following:

18. ***Company C and Company D***

A. *Company C* and *Company D* were closely associated through a person who was a principal in both companies (hereinafter "Principal of *Companies C and D*"). These companies offered investment management services for a fee.

B. In July 2006, the Principal of *Companies C and D* was instructed to deliver a $5,000 check to **JEFFREY BEASLEY** for the Kilpatrick Civic Fund.

C. On August 17, 2006, the Police and Fire Retirement System conditionally approved a $20 million investment in a joint venture/private equity real estate investment, which was presented to the board by *Company C*. **JEFFREY BEASLEY** voted in favor of this investment.

D. On September 7, 2006, the $5,000 check from *Company C*, previously written by the Principal of *Companies C and D*, was deposited into the Kilpatrick Civic Fund account.

E. On September 7, 2006, at a meeting of the Police and Fire Retirement System, **JEFFREY BEASLEY** made a motion that *Company D* be hired by the Board as an investment manager. The motion passed.

F. These companies received substantial fees from the Police and Fire Retirement System.

19. ***Company E***

A. *Company E* was an investment company that sought investment funds from the pension funds. **JEFFREY BEASLEY** solicited contributions to the Kilpatrick Civic Fund from *Company E* through a consultant for *Company E*. On September 5, 2007, the consultant for the *Company E* gave $20,000 to the Kilpatrick Civic Fund.

B. On September 27, 2007, **JEFFREY BEASLEY** brought a motion before the Police and Fire Retirement System to conditionally invest $10 million in *Company E*. The motion passed, and subsequently the Police and Fire Retirement System actually invested only $5 million in *Company E*.

C. On October 16, 2007, *Company E* gave $10,000 to the Kilpatrick Civic Fund.

D. On November 28, 2007, the General Retirement System voted to conditionally invest $10 million in *Company E*. **JEFFREY BEASLEY** voted in favor of this investment. Subsequently, the General Retirement System actually invested only $5 million in *Company E*.

E. *Company E* received substantial fees from the Retirement Systems during the course of the conspiracy.

F. The General Retirement System subsequently determined that its fund supporting retirees and beneficiaries had suffered a loss of $4,999,000 on its investment in *Company E*.

G. In Chicago, Illinois, during the course of and in furtherance of the

-12-

conspiracy, **JEFFREY BEASLEY** asked *Company E's* consultant for cash. The consultant then gave **JEFFREY BEASLEY** $3,000 in cash. On other occasions during the course of the conspiracy, **JEFFREY BEASLEY** asked the consultant for additional sums of money.

20. ***Company F***

A. *Company F* was a private equity firm that sought investment funds from both Retirement Systems.

B. On October 19, 2005, the General Retirement System conditionally approved a $10 million investment in the *Company F Fund*, which was managed by *Company F.* During the course of the conspiracy, *Company F* received substantial fees from the General Retirement System.

C. On April 6, 2006, the Police and Fire Retirement System conditionally approved a $10 million investment proposed by *Company F.* During the course of the conspiracy, *Company F* received substantial fees from the Police and Fire Retirement System.

D. In approximately May 2006, **JEFFREY BEASLEY** informed a representative of *Company F* that *Company F* needed to contribute $10,000 to the Kilpatrick Civic Fund and solicit another $10,000 donation to the Kilpatrick Civic Fund from company employees in order to obtain final approval of *Company F's* investment request from the Police and Fire Retirement System. The *Company F* representative agreed to donate the $10,000 and attempt to obtain another $10,000.

E.  On May 18, 2006, **JEFFREY BEASLEY** brought a motion before  the Police and Fire Retirement System to waive prior investment restrictions and invest $10 million in *Company F.*  **JEFFREY BEASLEY** and the Police and Fire Retirement System then voted in favor of making the $10 million investment in *Company F.*

F.  On June 23, 2006, *Company F* gave $10,000 to the Kilpatrick Civic Fund.

G.  On September 5, 2007, *Company F* gave $10,000 to the Kilpatrick Civic Fund.

21.  ***Company G***

A.  During the times relevant to this Indictment, *Company G* was an investment manager for the Police and Fire Retirement System, managing over $150 million in properties owned by the System.  During this period of time, *Company G* received substantial fees from the Police and Fire Retirement System.  As an investment manager, *Company G* served at the direction of the Board.  In addition, *Company G* promoted an additional investment known as the *Company G I Fund.*

B.  On June 8, 2006, the Police and Fire Retirement System conditionally approved a $20 million investment in the *Company G I Fund.*  **JEFFREY BEAS-LEY** voted in favor of this investment.

C.  One of the principals of *Company G* complied with requests by **JEFFREY BEASLEY** to give money to the Kilpatrick Civic Fund.  On June 23, 2006, *Company G* gave $10,000 to the Kilpatrick Civic Fund.  On September 5, 2007,

*Company G* gave $30,000 to the Kilpatrick Civic Fund. On June 24, 2008, *Company G* gave $10,000 to the Kilpatrick Civic Fund.

D. Besides complying with **JEFFREY BEASLEY's** requests to give money to the Kilpatrick Civic Fund, one of the principals of *Company G* provided other items of value to **JEFFREY BEASLEY** and other conspirators. In April 2007, **JEFFREY BEASLEY** asked the principal of *Company G* to include Kwame Kilpatrick, **JEFFREY BEASLEY**, and three other associates on a private jet flight that *Company G* had chartered to Las Vegas over the weekend of April 13, 2007, for a golfing trip. The cost of the flight was approximately $43,000. In addition, *Company G* paid for greens fees, lodging, meals, limousine service, concert tickets, and massages for Kwame Kilpatrick, **JEFFREY BEASLEY**, and the three other associates at a cost of approximately $23,000, which was not reimbursed.

E. In July 2007, **JEFFREY BEASLEY** asked a principal of *Company G* to charter a private plane for Kwame Kilpatrick to fly to Tallahassee, Florida. At a cost of more than $24,000, *Company G* then chartered the private plane so that Kwame Kilpatrick could go on a trip to Tallahassee over the weekend of July 20, 2007. One of the passengers on the flight to Tallahassee was the son of **JEFFREY BEASLEY**. No one from *Company G* went on this trip nor was *Company G* reimbursed by Kwame Kilpatrick or **JEFFREY BEASLEY**.

F. On July 25, 2007, **JEFFREY BEASLEY** asked a principal of *Company G* to give a job to **JEFFREY BEASLEY's** paramour. Subsequently, the principal

hired **JEFFREY BEASLEY's** paramour to work at *Company G*.

G.  In September 2007, **JEFFREY BEASLEY** asked one of the

principals of *Company G* to charter a private plane so that Kwame Kilpatrick could

fly to Bermuda, purportedly on business of the Kilpatrick Civic Fund.  At a cost of

more than $34,000, *Company G* then chartered a private plane over the weekend of

October 4, 2007 so that Kwame Kilpatrick, his wife, Bernard Kilpatrick, and his

companion could go on a trip to Bermuda.  No one from *Company G* went on this

trip nor was *Company G* reimbursed by Kwame Kilpatrick or **JEFFREY

BEASLEY**.

H.  In return for the things of value that the principal of *Company G* gave to

**JEFFREY BEASLEY**, Kwame Kilpatrick, and other conspirators, *Company G*

maintained its position as an investment manager and thereby earned substantial

fees.  In addition, *Company G* received approval from the Retirement Systems for a

proposal by the principal of *Company G* to move real estate assets, the limits of

which are governed by Michigan state statutes, into another investment category by

creating real estate trusts.  In this way, *Company G* was able to significantly increase

the real estate assets under its management and thereby benefit financially through

increased fees.

22. ***Company H***

A.  During the period from approximately 1990 to October 2007, the Police and

Fire Retirement System retained *Company H* as its consultant on real estate

-16-

investments.

B.  In August 2007, **JEFFREY BEASLEY** asked a representative of *Company H* to donate $15,000 to the Kilpatrick Civic Fund.  Over the telephone, **JEFFREY BEASLEY** asked the representative of *Company H* to "Send me a love offering from [*Company H*]."  *Company H* did not donate to the Kilpatrick Civic Fund.

C.  On October 11, 2007, following its failure to donate to the Kilpatrick Civic Fund, the Police and Fire Retirement System voted to terminate *Company H* as a consultant on real estate investments after seventeen years of service.  **JEFFREY BEASLEY** voted in favor of the termination.

23.  ***Company I***

A.  *Company I* was a media company that sought investment money from the Retirement Systems.

B.  On August 22, 2007, the General Retirement System voted to conditionally invest $7.5 million in *Company I*.  **JEFFREY BEASLEY** voted in favor of this investment.

C.  Between September 2007 and July 2008, *Company I* and a consultant for *Company I* gave $45,000 to the Kilpatrick Civic Fund.  These contributions were solicited by **JEFFREY BEASLEY** or *Company I's* consultant.

D.  On September 17, 2008, less than two months after *Company I* had donated $10,000 to the Kilpatrick Civic Fund, **JEFFREY BEASLEY** voted to invest an additional $8 million in *Company I*.  Including the vote of **JEFFREY BEASLEY**,

the General Retirement System approved this additional investment.

E. The General Retirement System subsequently determined that its fund supporting retirees and beneficiaries had suffered a loss of $13.3 million on its investment in *Company I*.

F. On at least two occasions during the course of the conspiracy, **JEFFREY BEASLEY** asked a principal of *Company I* for money.

## Additional Losses Suffered By the Retirement Systems from Investments from Companies that Donated to the Kilpatrick Civic Fund

24. *Company J* was an investment company that received a $5 million investment from the General Retirement System and a $2 million investment from the Police and Fire Retirement System. In securing these investment monies, *Company J* had made significant donations to the Kilpatrick Civic Fund at the request of **JEFFREY BEASLEY**. The General Retirement System determined that its fund supporting retirees and beneficiaries suffered a loss of $4.95 million on its investment in *Company J*. The Police and Fire Retirement System determined that its fund supporting retirees and beneficiaries suffered a loss of $940,000 on its investment in *Company J*.

25. *Company K* was an off-shore investment company that received a $20 million investment from the General Retirement System and a $20 million investment from the Police and Fire Retirement System. In securing those investment monies, *Company K* had made significant donations to the Kilpatrick Civic Fund at the request of **JEFFREY BEASLEY**. The General Retirement System subsequently determined that its fund supporting retirees and beneficiaries lost all of its $20 million investment in *Company K*.

The Police and Fire Retirement System also subsequently determined that its fund

supporting retirees and beneficiaries lost all of its $20 million investment in *Company K*.

## JEFFREY BEASLEY BIRTHDAY PARTY

26. On January 26, 2007, at the Atheneum Hotel in Detroit, **JEFFREY BEASLEY**

was the guest of a birthday party thrown in his honor. The party was organized, in part,

by *Attorney A*, who solicited large cash donations for the party. Many of the guests were

persons who received compensation, investment monies, or other items of value from the

General Retirement System or the Police and Fire Retirement System in various

capacities, including providing legal services for the Systems; people seeking investments

from the Systems; and consultants for the people seeking investments. In order to attend

the party, these people were asked to donate large sums of cash for a birthday present for

**JEFFREY BEASLEY**, who consequently received thousands of dollars in cash as a

"birthday present" at the party.

27. On August 16, 2007, at the Atheneum Hotel in Detroit, *Trustee A* and *Trustee B*

of the Police and Fire Retirement System were the guests at a birthday party thrown in

their honor. The party was organized, in part, by *Attorney A*, who solicited large cash

donations for the party. Many of the guests were persons who received compensation,

investment monies, or other items of value from the Police and Fire Retirement System in

various capacities, including providing legal services for the System; people seeking

investments from the System; and consultants for the people seeking investments. In

order to attend the party, these people were asked to donate large sums of cash for

birthday presents for *Trustee A* and *Trustee B*, who consequently received approximately $5,000 each in cash as "birthday presents" at the party.

28.  At the October 18, 2007 meeting of the Police and Fire Retirement System, **JEFFREY BEASLEY** made a motion to substantially increase the hourly rate of *Attorney B*, one of the people who had given cash to **JEFFREY BEASLEY**, *Trustee A*, and *Trustee B* at the parties.  At that same meeting, **JEFFREY BEASLEY** seconded a motion by *Trustee A* to substantially increase the annual salary of *Attorney A*, who had organized the parties and had solicited large cash donations for the "birthday presents" for **JEFFREY BEASLEY**, *Trustee A*, and *Trustee B*.  *Trustee A* and *Trustee B* voted in favor of both motions.  Those motions passed, with a vigorous dissent.

29.  At the November 7, 2007 meeting of the General Retirement System, **JEFFREY BEASLEY** made a motion to substantially increase the annual salary of *Attorney A* for the General Retirement System who had organized the party and had solicited large cash donations for the "birthday present" for **JEFFREY BEASLEY**.

### *COMPANY L*

30. *Company L* was an investment firm specializing in the communications industry that sought investment money from the Retirement Systems.

31. On March 15, 2006, *Company L* entered into a consulting contract with Marc Andre Cunningham, who, according to the terms of the contract, was to receive $25,000 quarterly for three years. In approximately July 2006, Cunningham became Mayor of Detroit Kwame Kilpatrick's executive assistant.

-20-

32.  On March 26, 2006, Cunningham introduced **JEFFREY BEASLEY** to one of the principals of *Company L* who wanted to obtain investments from the Retirement Systems for a private equity fund that he was promoting.

33.  On May 3, 2006, the General Retirement System voted to conditionally approve a $15 million investment in *Company L*, with **JEFFREY BEASLEY** voting in favor of the investment.

34.  On May 18, 2006, the Police and Fire Retirement System voted to conditionally approve a $15 million investment in *Company L*, with **JEFFREY BEASLEY** voting in favor of the investment.

35.  During the course of the conspiracy, **JEFFREY BEASLEY** solicited contributions from *Company L* to the Kilpatrick Civic Fund.

36.  On June 30, 2006, *Company L* gave $25,000 to the Kilpatrick Civic Fund.

37.  On October 16, 2007, *Company L* gave $10,000 to the Kilpatrick Civic Fund.

38.  On October 4, 2006, at the direction of Kwame Kilpatrick, Cunningham met with Bernard Kilpatrick at the Coleman A. Young Municipal Center and provided Bernard Kilpatrick with at least $4,000 in cash.  It was understood between Cunningham and Kwame Kilpatrick that this and future payments were to be made to Bernard Kilpatrick to reward Kwame Kilpatrick for his support of the investments by the General Retirement System and the Police and Fire Retirement System.  Following the October 2006 payment, while continuing to receive his $25,000 quarterly payments from *Company L*, Cunningham continued to kick back a portion of this money to Bernard

-21-

Kilpatrick.

39.  While receiving his $25,000 quarterly payments from *Company L*, Cunningham also kicked back a portion of these payments to **JEFFREY BEASLEY** by giving him cash.  In total, Cunningham gave approximately $20,000 in cash to **JEFFREY BEASLEY**.

### *COMPANY M*

40.  *Company M* was a private equity firm that sought investment monies from the Retirement Systems to invest in other companies.

41.  On December 21, 2006, the Police & Fire Retirement System voted to conditionally approve a $10 million investment with *Company M.*  **JEFFREY BEAS-LEY** voted in favor of the investment.

42.  On January 10, 2007, the General Retirement System voted to conditionally approve a $10 million investment with *Company M*.  **JEFFREY BEASLEY** voted in favor of the investment.

43.  On May 31, 2007, **JEFFREY BEASLEY** brought a motion before the Police and Fire Retirement System to approve the request by the owner of *Company M* to eliminate an investment restriction that would otherwise prohibit the $10 million investment from going forward.  In addition, **JEFFREY BEASLEY** moved that the Police and Fire Retirement System authorize up to $10 million in wire transfers to *Company M*.  Both motions by **JEFFREY BEASLEY** were approved.

44.  On June 6, 2007, **JEFFREY BEASLEY,** brought a motion before the General

Retirement System to approve the request by the owner of *Company M* to eliminate an investment restriction that would otherwise prohibit the General Retirement System from making the requested investment. **JEFFREY BEASLEY** also brought a motion to authorize up to $10 million in wire transfers to *Company M*.

45.  In August 2007, the owner of *Company M* paid for a vacation at a luxury hotel in the Turks and Caicos Islands for **JEFFREY BEASLEY**, his wife, and their children. During the vacation, the owner of *Company M* gave money to **JEFFREY BEASLEY** for gambling and other expenses.

46.  The owner of *Company M* used investment monies from the Retirement Systems to invest in *Company N*.  *Company N* was a company which specialized in the sales of automobiles to people with bad credit, and it was supposed to use the investment monies for its operations.

47.  On September 5, 2007, the owner of *Company M* gave $20,000 to the Kilpatrick Civic Fund.

48.  On September 5, 2007, the owner of *Company N* gave $10,000 to the Kilpatrick Civic Fund.

49.  On October 11, 2007, **JEFFREY BEASLEY** and the Police and Fire Retirement System voted to approve the owner of *Company M's* request that the System wire $1,150,000 to *Company M*.

50.  On July 3, 2008, the owner of *Company M* gave $10,000 to the Kilpatrick Civic Fund.

51. On July 3, 2008, the owner of *Company N* gave $5,000 to the Kilpatrick Civic Fund.

52. During the course of the conspiracy, the owner of *Company M* embezzled approximately $3 million in pension monies from the General Retirement System and the Police and Fire Retirement System for his personal use.

53. The General Retirement System subsequently determined that its fund supporting retirees and beneficiaries lost all of its $10 million investment in *Company M*.

54. The Police and Fire Retirement System subsequently determined that its fund supporting retirees and beneficiaries lost all of its $10 million investment in *Company M*.

## LOSSES SUFFERED BY THE RETIREMENT SYSTEMS

55. Collectively, as detailed earlier, the funds of the General Retirement System and the Police and Fire Retirement System, that support retirees and beneficiaries, suffered losses of at least $84.18 million from investments associated with the scheme to defraud and with **JEFFREY BEASLEY's** acts in furtherance of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2

### (18 U.S.C. § 1951  - Interference with Commerce by Extortion)

**D-1 JEFFREY BEASLEY**

On or about January 26, 2007, in the Eastern District of Michigan, the defendant,

**JEFFREY BEASLEY**, did knowingly and unlawfully obtain property, that is, thousands of dollars in cash which were supposedly birthday gifts, from persons doing business with

-24-

the Detroit General Retirement System and the Police and Fire Retirement System, with

the consent of the givers, under color of official right, which conduct affected interstate

commerce.

In violation of Title 18, United States Code, Section 1951.

## COUNT 3

### (18 U.S.C. § 1951  - Interference with Commerce by Extortion)

**D-1 JEFFREY BEASLEY**

At various times from in or about February 2007 until in or about 2008, in the

Eastern District of Michigan, the defendant, **JEFFREY BEASLEY**, did knowingly and

unlawfully obtain property, that is, thousands of dollars in cash and other things of value,

from the owner of *Company A*, who obtained investments from the Detroit General

Retirement System and the Police and Fire Retirement System, with the consent of the

giver, under color of official right and by wrongful fear of economic harm, which conduct

affected interstate commerce.

In violation of Title 18, United States Code, Section 1951.

## COUNT 4

### (18 U.S.C. § 1951  - Interference with Commerce by Extortion)

**D-1 JEFFREY BEASLEY**

At various times from at least January 18, 2007 until in or about March 2009, in the

Eastern District of Michigan, the defendant, **JEFFREY BEASLEY**, did knowingly and

unlawfully obtain property, that is, thousands of dollars in cash, relating to the

investments by the Detroit General Retirement System and the Police and Fire Retirement System in *Company L*, with the consent of the giver, under color of official right, which conduct affected interstate commerce.

In violation of Title 18, United States Code, Section 1951.

## COUNT 5

### (18 U.S.C. § 1951  - Interference with Commerce by Extortion)

### D-1 JEFFREY BEASLEY

In or about April 2007, in the Eastern District of Michigan, the defendant, **JEFFREY BEASLEY**, did knowingly and unlawfully obtain property, that is, travel and entertainment worth approximately sixty-seven thousand dollars, from a principal of *Company G*, which was acting as an investment manager for the Detroit General Retirement System and the Police and Fire Retirement System, with the consent of the giver, under color of official right and by wrongful fear of economic harm, which conduct affected interstate commerce.

In violation of Title 18, United States Code, Section 1951.

## COUNT 6

### (18 U.S.C. § 1951  - Attempted Interference with Commerce by Extortion)

### D-1 JEFFREY BEASLEY

In or about August 2007, in the Eastern District of Michigan, the defendant, **JEFFREY BEASLEY**, did knowingly and unlawfully attempt to obtain property, that is, fifteen thousand dollars, from a representative of *Company H*, with the consent of the

giver, under color of official right and by wrongful fear of economic harm, which conduct affected interstate commerce.

In violation of Title 18, United States Code, Section 1951.

## CRIMINAL FORFEITURE ALLEGATIONS

### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461)

1.   Upon conviction of one or more counts of conspiracy to commit honest services mail and wire fraud or interference with commerce by extortion, in violation of Title 18, United States Code, Sections 1349 and 1951, as alleged in Counts 1, 2, 3, 4, and/or 5 of this Indictment, Defendant **JEFFREY BEASLEY** shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, his right, title, and interest in any property, real or personal, which constitutes or is derived from proceeds traceable to conspiracy to commit honest services mail and wire fraud or interference with commerce by extortion, in violation of 18 U.S.C. §§ 1349 and 1951.

2.   Property subject to forfeiture to the United States includes, but is not limited to, the following:

A.   Approximately seventy thousand dollars ($70,000.00) in United States Currency, as monies obtained from the owner of *Company A*, as alleged in Counts 1 and/or 3 of this Indictment;

B.   Approximately ten thousand dollars ($10,000.00) in United States Currency, as monies related to the January 26, 2007 party, as alleged in Counts 1 and/or 2 of this Indictment;

C.   Approximately twenty thousand dollars ($20,000.00) in United States Currency, as monies related to the *Company L* deal, as alleged in Count 1 and/or 4 of this Indictment; and

D.  Approximately one hundred twenty-five thousand dollars ($125,000.00) worth of travel and entertainment expenses related to *Company G*, as alleged in Counts 1 and/or 5 of this Indictment.

3.  Substitute Assets:  Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), Defendant **JEFFREY BEASLEY** shall forfeit substitute property, up to the value of the properties described in paragraph Two above, if, by any act or omission of the defendant, the property described in paragraph Two:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred, sold to or deposited with a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty.

All in accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28,

United States Code, Section 2461(c); and Rule 32.2, Federal Rules of Criminal

Procedure.

THIS IS A TRUE BILL

s/Grand Jury Foreperson
GRAND JURY FOREPERSON

**Barbara McQuade**
United States Attorney

s/Robert Cares
**Robert Cares**
Assistant United States Attorney

s/David A. Gardey
**David A. Gardey**
Assistant United States Attorney

Dated: January 18, 2012

# ORIGINAL

| United States District Court<br>Eastern District of Michigan | Criminal Case Cover Sheet | Case Number |
|---|---|---|

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

**Reassignment/Recusal Information** This matter was opened in the USAO prior to August 15, 2008   **[ NO ]**

| **Companion Case Information** | **Companion Case Number: 10-20403** |
|---|---|
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]:<br>U.S. v. Kwame M. Kilpatrick, et al | **Judge Assigned:** Nancy G. Edmunds |
| ■ Yes      ☐ No | **AUSA's Initials:** DAG |

**Case Title:** USA v.  JEFFREY BEASLEY

Case: 2:12-cr-20030
Judge: Tarnow, Arthur J.
MJ: Michelson, Laurie J.
Filed: 01-18-2012 At 01:18 PM
SEALED MATTER: USA V. SEALED MATTER
(KB)

**County where offense occurred :** Wayne

**Check One:**      ■ **Felony**          ☐ **Misdemeanor**                    ☐ **Petty**

  X  Indictment/_____Information --- **no prior complaint.**

_____Indictment/_____Information --- based upon prior complaint **[Case number: ]**

_____Indictment/_____Information --- based upon LCrR 57.10 (d) *[Complete Superseding section below]*.

## Superseding Case Information

**Superseding to Case No:** _____      **Judge:** _____

☐      Original case was terminated; no additional charges or defendants.

☐      Corrects errors; no additional charges or defendants.

☐      Involves, for plea purposes, different charges or adds counts.

☐      Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable** |
|---|---|---|

Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.

January 18, 2012
Date

DAVID A. GARDEY
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226-3277
Phone:  (313) 226-9591
Fax: (313) 226-3413
E-Mail address:  David.Gardey@usdoj.gov

---

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

10/13/09