UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

JEFFREY BEASLEY, ET AL.,

      Defendants.

_____/

Case No. 12-20030

Honorable Nancy G. Edmunds

**OPINION AND ORDER DENYING DEFENDANTS' RULE 29 MOTIONS FOR
ACQUITTAL AND RULE 33 MOTIONS FOR A NEW TRIAL [431, 432, 434, 435] AND
JOINDERS [436, 437, 438, 439, 442, 444, 445]**

On December 8, 2014, following an extensive jury trial that began on October 16,

2014, Defendants Jeffrey Beasley, Paul Stewart, and Ronald Zajac ("Defendants") were

found guilty of conspiring to commit honest services fraud in violation of 18 U.S.C. § 1341

*et seq* (Count 1).  In addition, Defendant Beasley was convicted of two counts of extortion

under the Hobbs Act, 18 U.S.C. § 1951,[1] and one count of bribery in violation of 18 U.S.C.

§ 666 (Counts 2, 4, and 7 respectively).

Currently before the Court are various post-verdict motions filed by Defendants

seeking either acquittal or a new trial under Federal Rules of Criminal Procedure 29 and

33.  More specifically, Beasley argues that (1) the evidence was insufficient to establish the

essential elements of the crimes, and (2) the Government's closing argument was unduly

inflammatory. (Dkt. 434). Beasley's motion is joined by Zajac in its entirety (Dkt. 438), and

_____

[1]  Beasley was acquitted on three additional counts of extortion, to wit: Counts 3,
5, and 6.

by Stewart only with regard to the alleged impropriety of the Government's closing. (Dkt. 445). With respect to Stewart's motions, he likewise argues that the evidence was insufficient to establish his guilt and also maintains that there was a constructive amendment and/or prejudicial variance to the indictment. (Dkt. 431 & 432). Stewart's motions are joined by Beasley and Zajac without exception. (Dkt. 436, 437, 439). Finally, in addition to raising many of the same challenges as Beasley and Stewart, Zajac argues that (1) the Seventh Superseding Indictment is barred by the statute of limitations, and (2) the Court erred by admitting certain recorded conversations involving Bernard Kilpatrick. (Dkt. 435). Zajac's motion is joined by Beasley with regard to his sufficiency of the evidence, constructive amendment/variance, and prosecutorial misconduct arguments, (Dkt. 442), and by Stewart with respect to his statute of limitations and prosecutorial misconduct challenges. (Dkt . 444).

For the reasons stated more fully below and on the record at the April 8, 2015 hearing, the Court DENIES Defendants' motions.

## I.   Background

The City of Detroit maintains two pension funds for its employees: the General Retirement System ("GERS") and the Police and Fire Retirement System ("PFRS") (collectively, the "Retirement Systems"). The Retirement Systems are governed by two separate Boards of Trustees ("Trustees") whose primary responsibility is to serve and protect the collective interest of all fund beneficiaries. Part and parcel of this obligation is the duty to manage and invest the assets of the Retirement Systems in a prudent manner. This requires, among other things, the consideration of new investment opportunities proposed by individuals interested in doing business with the Retirement Systems. The

2

evidence presented at trial centered on the corrupt "pay-to-play" relationship between certain Trustees, the General Counsel to the Retirement Systems, and individuals seeking investment funds. In very simplistic terms, the scheme involved a series of bribes and kickbacks in exchange for votes in favor of various investment proposals pending before the Retirement Systems.

Between 2010 and 2013, the Government indicted six individuals in connection with this scheme: Jeffrey Beasley, the former Treasurer for the City of Detroit and, by virtue of his office, Trustee to the Retirement Systems; Paul Stewart, an elected Trustee of the PFRS; Ronald Zajac, General Counsel to the Retirement Systems; Chauncey Mayfield, chief executive officer of Mayfield Gentry Realty Advisors, LLC and investment advisor to the Retirement Systems; George Stanton, chief of staff to a former trustee of the PFRS; and Roy Dixon, owner of Onyx Capital Advisers, LLC, a private equity firm seeking investment funds from the Retirement Systems.  With the exception of Beasley, Stewart, and Zajac, all Defendants reached a plea agreement with the Government and testified at trial.

The genesis of the Government's theory of the case–and the evidence presented at trial–revolved around several investment proposals pending before the Retirement Systems between 2006 and 2009, and the parties, trips, and backroom discussions simultaneously taking place between Defendants and the investors seeking the Trustees' vote of approval. While the specific role of each individual is explored more fully in the analysis that follows, the Government presented a plethora of evidence linking Defendants to an extensive and elaborate scheme designed to line their own pockets at the expense of fund beneficiaries. Indeed, as the evidence made clear, Defendants' conduct represents a depressingly

3

common dynamic that has plagued Detroit city government for much of the last decade. Against this backdrop, the Court endeavors to address the multitude of Defendants' legal and evidentiary challenges to the jury's verdict in this case.

## II.   Rule 29 Motions for Acquittal

At the close of the Government's case, Defendants moved for a judgment of acquittal. (Dkt. 370, 373, 375). The Court denied Defendants' individual motions, finding sufficient evidence in the record to submit the charges in the challenged counts to the jury. (Dkt. 422, Mot. J. Acquittal Hr'g Tr. 16-17, 37-39, 64). The trial continued to a jury verdict of guilt as to each Defendant on the charges described above. Defendants' renewed Rule 29 motions are, to a large extent, a refined version of their previous arguments. The Court incorporates by reference its prior findings and conclusions set forth on the record, and rejects any challenges not specifically raised–and developed–in Defendants' post-trial motions for the reasons stated therein.

### A.  Standard of Review

"Evidence is sufficient to sustain a conviction if after viewing the evidence in the light most favorable to the prosecution, and after giving the government the benefit of all inferences that could reasonably be drawn from the testimony, any rational trier of fact could find the elements of the crime beyond a reasonable doubt." *United States v. Driver*, 535 F.3d 424, 428–29 (6th Cir. 2008) (internal quotation marks and citations omitted). "In examining claims of insufficient evidence, this court does not weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *Id.* (internal quotation marks and citation omitted). As the Sixth Circuit recently observed, "defendants bear a heavy burden when asserting insufficiency of the evidence

4

arguments." *United States v. Wettstain*, 618 F.3d 577, 583 (6th Cir. 2010). That is because "[c]ircumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt," and "the uncorroborated testimony of an accomplice alone may support a conviction." *Id.* (internal quotation marks and citations omitted).

### B.  Analysis

The Court begins with Defendants' individual challenges to the sufficiency of the evidence and then addresses their arguments concerning an alleged constructive amendment/variance to the Indictment. In addition, the Court also briefly discusses Zajac's statue of limitations argument.

### 1.  Individual Sufficiency of the Evidence Arguments

The jury found Beasley, Stewart, and Zajac guilty as charged in Count 1 of the Seventh Superseding Indictment (the "Indictment") for conspiring to commit honest services fraud in violation of 18 U.S.C. § 1341. Stewart and Zajac have both lodged specific challenges to the sufficiency of the evidence supporting their convictions under Count 1, which the Court addresses here.

As the Court instructed the jury, the essential elements necessary to convict a defendant of conspiracy to commit honest services fraud beyond a reasonable doubt are: (1) the individual knowingly devised or participated in a scheme to defraud current and former beneficiaries of the Retirement Systems of their right to the honest services of certain public officials or their representatives through bribery or kickbacks; (2) an individual identified in the count did so knowingly and with an intent to defraud; (3) that same individual committed a material misrepresentation or concealment of a material fact; and

5

(4) in furtherance or execution of this scheme the individual used the mails or interstate wire communications. *See* (Trial Tr. Vol. 31 at 30); Sixth Circuit Pattern Instruction 10.01; *United States v. Dimora*, 879 F. Supp. 2d 718, 731-32 (N.D. Ohio 2012). Thus, in order to obtain a conviction for conspiracy to commit honest services mail fraud, the Government was required to show that (1) two or more persons conspired, or agreed, to commit honest services fraud, and (2) that each individual knowingly and voluntarily joined the conspiracy. (Trial Tr. Vol. 31, 23-24).

### a.    Defendant Stewart

Stewart's sufficiency challenge to Count 1 can be summarily disposed of for several reasons. First, while Stewart expressly renewed his initial challenge to the sufficiency of the evidence in his post-trial Rule 29 motion, he failed to offer any new discussion that the Court hasn't already considered and rejected. Indeed, the entirety of Stewart's argument on this score is as follows: "[a]s previously argued in Stewart's Rule 29 motion that was filed at the close of the government's case . . . there was constitutionally insufficient evidence for the pre-amended charge in Count 1 to go forward . . . ." As such, the Court sees little value in revisiting its prior decision denying Stewart's sufficiency challenge. *See* (Trial Tr. Vol. 26, 16-17).

As a more practical matter, however, Stewart's own admissions at trial virtually foreclose him from making any argument concerning the sufficiency of the evidence. In August of 2007, for example, Stewart admitted to receiving $5,000 in cash "from a number of investment sponsors and money managers who were in attendance at [a birthday] party" organized on his behalf by Defendant Zajac. (Trial Tr. Vol. 27, 74-75). Indeed, the Government elicited testimony from at least three individuals (Chris Jackson, Derek Batts,

6

and Tom Zdrodowski) with business before the PFRS who acknowledged making a cash contribution to Stewart's party. *Id.* Moreover, the testimony of these individuals was clear that the purpose of their contributions was to "endear" themselves to Stewart and the other Trustees.

The birthday party is hardly the most damning of Stewart's admissions. In December of 2007, for example, he admitted to receiving "a $5,000 casino chip from Jim Papas . . . ." (Trial Tr. Vol. 27 at 96). As a third-party marketer, Papas frequently sought investment funds from the PFRS. In fact, in the same month Stewart acknowledged receiving the casino chip, Papas was paid "$600,000 as a third-party marketer for [the BlackEagle] transaction . . . . " (*Id.* at 98).  As if the timing of the BlackEagle deal was not suspicious enough, Stewart also acknowledged receiving "approximately 10 to $11,000 from Steve Pankake"–another third-party marketer–during a time when Pankake was actively pitching a real estate investment before the PFRS. (*Id.* at 57-58). In the end, Stewart voted in favor of the deal, resulting in a "consultant fee" to Pankake of over $500,000. Stewart openly admitted that he failed "to disclose to [his] fellow board members that [he] had received 10 to $11,000 in cash from Steven Pankake" prior to voting in favor of his deal. (*Id.* at 60). While the courts have been clear that "the government does not have to prove an explicit promise to perform a particular act made at the time of payment", *United States v. Ganim*, 510 F.3d 134, 144 (2d Cir. 2007), Stewart's conduct strongly suggests the he "understood that he . . . was expected to exercise some influence on the payor's behalf as opportunities arose," which is all that is required.  *United States v. Abbey*, 560 F.3d 513, 518 (6th Cir. 2009).

Finally, in addition to the direct evidence of guilt supplied by Stewart, a number of

7

individuals doing business with the PFRS offered their own accounts of illicit dealings with Stewart. Perhaps the most incriminating testimony came from Robert Shumake, an investment promoter with a significant interest in the infamous "ICG Leaseback" deal. According to Shumake, he provided cash to Stewart on at least four separate occasions in order to influence Stewart's vote on various deals pending before the PFRS. *See* (Trial Tr. Vol. 8, 93, 97, 99, 100). Most notably, around November of 2007, Shumake, at the suggestion of Zajac, provided Stewart with $2,500 in "entertainment expenses" during a conference in New York. (*Id.* at 93). The following month, Stewart voted in favor of restructuring the ICG Leaseback deal and converting the PFRS' $40 million equity position into a loan transaction. (*Id.* at 90). According to the terms of the new deal, the PFRS paid the managing member (Robert Shumake) a two percent "acquisition fee" for restructuring the transaction. (Gov't Ex. ICG-26_011). In other words, Stewart's relationship with Shumake–not unlike his ties to Roy Dixon, Steve Pankake, and Jim Papas–symbolizes precisely the type and character of conduct constituting honest services fraud.

Accordingly, the Court finds that there was substantial evidence in support of the jury's verdict that the cash and other gifts received by Stewart were intended to influence his official actions as a trustee with the PFRS. Stewart's motion for acquittal is thus DENIED.

### b.    Defendant Zajac

Defendant Zajac was likewise convicted of conspiracy to commit honest services fraud under Count 1 of the Indictment. The focus of his Rule 29 evidentiary challenge revolves around the Government's alleged failure to prove the existence of a conspiracy.

As the Court instructed the jury, the Government was required to prove two elements

8

in support of the conspiracy component charged under Count 1. First, there must be a criminal agreement to achieve an unlawful objective. More specifically,

> the government must prove that two or more persons conspired, or agreed, to cooperate with each other to commit the crime of mail fraud and/or wire fraud. This does not require proof of any formal agreement, written or spoken. Nor does this require proof that everyone involved agreed on all the details. But proof that people simply met together from time to time and talked about common interests, or engaged in similar conduct, is not enough to establish a criminal agreement. An agreement can be proved indirectly, by facts and circumstances which lead to a conclusion that an agreement existed.

(Trial Tr. Vol. 6, 16-17). Next, the Government must produce evidence establishing each individual Defendants' connection to the conspiracy. In other words,

> the government must prove that [each defendant] knew the conspiracy's main purpose, and that he voluntarily joined it intending to help advance or achieve its goals. This does not require proof that the defendant knew everything about the conspiracy, or everyone else involved, or that he was a member of it from the very beginning.  Nor does it require proof that the defendant played a major role in the conspiracy, or that his connection to it was substantial.  A slight role or connection may be enough. But proof that the defendant simply knew about a conspiracy, or was present at times, or associated with members of the group, is not enough, even if he approved of what was happening or did not object to it.  Similarly, just because the defendant may have done something that happened to help a conspiracy does not necessarily make him a conspirator.

(Trial Tr. Vol. 6, 17-18).

The Sixth Circuit is in accord with the definitions of "agreement" and "connection to the conspiracy" provided by the Court. Indeed, of particular relevance here, "proof of a formal agreement is not necessary; a tacit or material understanding among the parties will suffice." *United States v. Avery*, 128 F.3d 966, 970–71 (6th Cir. 1997). Moreover, the existence of a conspiracy "may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *Id.* at 971 (citation omitted).

9

Once a conspiracy is shown beyond a reasonable doubt, however, a defendant's connection to the conspiracy "need only be slight." *Id.* Similarly, "a defendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence." *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001).

Review of the record reflects ample evidence indicating that Zajac, as general counsel to the Retirement Systems, was intimately involved in a conspiracy with Beasley, Stewart, and several individuals with business before the boards to deprive Detroit city pensioners of their right to the honest services of the Trustees. In fact, several events portrayed over the course of the trial suggest that Zajac operated as the chief architect of the conspiracy, working behind the scenes to facilitate the bribes and kickbacks at the very heart of the scheme.

Consider, for example, Zajac's role in organizing the so-called birthday parties for Beasley and Stewart in 2007. Tom Zdrodowski and others testified that Zajac invited them to the parties and made it clear that all attendees–most of whom were individuals with business before the Retirement Systems–were to bring cash gifts. *See e.g.*, (Trial Tr. Vol. 15, 42- 43). Both Beasley and Stewart corroborated Zajac's involvement in their respective parties. Indeed, Stewart testified that "Zajac was instrumental in putting [the party] together" and that he "gave me a envelope, and then later that evening or whatever, I counted the contents of the envelope, and it revealed it was $5,000." (Trial Tr. Vol. 27 at 73). Beasley's recollection was nearly identical; "Q: Well, while you were a trustee–well, you know, Mr. Zajac handed you an envelope, and it contained $9,000, correct? A: Yes." (Trial Tr. Vol. 28, 130-31). Perhaps not entirely by coincidence, in October 2007–just months after the birthday parties–Beasley and Stewart voted to increase Zajac's salary as general counsel

to the Retirement Systems by over 33%. Certainly, the jury was free to conclude that there was a causal connection between Zajac's "fundraising" efforts and Stewart and Beasley's vote in support of his raise.

In addition, as the Court previously discussed, there is substantial evidence that Zajac was involved in the ICG Leaseback part of the conspiracy. Indeed, Shumake specifically sought Zajac's guidance with respect to restructuring the ICG deal during a pension conference in New York.  Zajac's advice was simple: "give money to a few of the trustees for entertainment expenses." (Trial Tr. Vol. 8 at 93). Shumake, recognizing Zajac's influence, obliged and provided Stewart and Martin Bandemer (a trustee of the PFRS) with $2,500 each. *(Id.* at 93-94). Within a month after receiving the money, Stewart and Bandemer voted in favor of converting the ICG transaction into a debt position. *(Id.* at 91-94). A little less than a year later, Shumake provided Stewart and Bandemer with yet another $2,500 payment at the request of Zajac. (*Id.* at 97). At this point, Shumake understood that providing entertainment expenses for the Trustees was "a part of the process" for investment managers. *Id.*

Zajac's influence–and role in the overall scheme–was perhaps best described by Chauncey Mayfield, an investment advisor to the Retirement Systems:

> Q. And why would you be concerned about Ron Zajac's perception of you as a team player or not a team player?
>
> A. Well, I knew that he would oftentimes say we have to keep the trustees happy, and part of that was picking up their tab, and so it was a combination of Ron–I mean, Mr. Zajac and the trustees, the other trustees, that he would share with them,'Well, he's not a team player. He doesn't, you know, pay for any drinks or anything like that.'
>
> Q. And why would it be important to you that Ron Zajac or the trustees view you as a team player?

11

A. Well, I think the most important reason is . . . you know . . . to protect my company and my employees.

. . . .

Q. So based upon the influence that you believe that Ronald Zajac had over the trustees, did you feel compelled to concede to requests that he made to you with respect to covering certain expenses?

A. Yes.

(Trial Tr. Vol. 10, 114-15; 128-29). During the conference in New York, for example, Mayfield covered $10,000 in limousine expenses so that Zajac and the Trustees could travel together to various dinners and shopping excursions sponsored by "somebody doing business with the pension board." (*Id.* at 126-27). This dynamic–providing "entertainment expenses" for the Trustees at Zajac's direction–became embedded in the culture of doing business with the Retirement Systems. *See e.g.,* Trial Tr. Vol. 21 at 10 (Roy Dixon testified that "Mr. Zajac would often ask for money when the board would go on these excursions to Las Vegas and every once in awhile, Florida."); Trial Tr. Vol. 13 at 64 (According to Derek Batts, "Mr. Zajac explained to me that they rotated the bills among the [investment] managers so that no individual manager would be stuck with the bill all the time.").

As time went on, Zajac's requests became more brazen–and personal. Indeed, recorded phone conversations between Bernard Kilpatrick and Michael Wayne suggest that Zajac attempted to shake down investment sponsor Wayne in connection with his request for additional capital to fund the "CROCI" deal. According to the calls, Zajac demanded that Wayne sponsor a trip to London for him and the Trustees in exchange for the additional $10 million investment he was seeking:

> the attorney, Ron Zajac, was there talking. So, you know, he pulls me aside and he says, hey, he goes, here's what the deal is. He goes, we want to make this happen in the beginning of the year whether we place the money in January or February, we're trying to get this done. You gotta get back with

12

me in one week. I want you to write a letter to the Board saying that you want
to sponsor a trip to London.
.....
We're gonna give you another ten [million] but you've got to, you've got to
finance us to go to London.

(Gov't Ex. CROCI 23, 24). In other words, Zajac's involvement with and ties to the

conspiracy, cutting across many different investments and periods of time, played a crucial

role in the illicit conduct charged under Count 1 of the Indictment.

Zajac argues that the evidence tying him to the conspiracy is no greater than the

factual circumstances giving rise to the defendant's acquittal in *United States v. Sliwo*, 620

F.3d 630 (6th Cir. 2010). This couldn't be further from the truth. In *Sliwo*, the defendant was

convicted of conspiracy to commit a drug trafficking offense in violation of 21 U.S.C. § 846.

*Id.* at 632. The evidence adduced at trial suggested that the defendant served as a lookout

on several occasions while his co-conspirators personally loaded several hundreds of

pounds of marijuana into a van. *Id.* at 633. On appeal, the court found  that while the

Government produced evidence of the defendant arranging the transport of the van *before*

it was loaded with drugs, they "failed to present sufficient evidence tying Defendant to the

actual drugs found." *Id.* at 636. As the court explained, this distinction is critical:

the government's evidence only shows that Defendant was participating in
a scheme with his co-defendants and fails to demonstrate any link between
Defendant and the marijuana. The best argument for the government is that
evidence of close coordination is sufficient for a jury to infer knowledge when
no evidence links Defendant to the drugs. In the instant case, however, the
government has only showed Defendant transporting the empty van and
serving as a lookout. The 'web of inference is too weak' on these facts to
permit any rational trier of fact, absent sheer speculation, to find beyond a
reasonable doubt that [Defendant] had knowledge of the hidden drugs.

*Id.* at 637 (internal citation omitted).

The primary takeaway from *Sliwo* is clear–the Government must produce evidence

13

tying the defendant to the criminal objective of the conspiracy. Indeed, the court placed great emphasis on the fact that "[t]he government failed to provide any evidence of any observed conversations between Defendant and his alleged co-conspirators." *Id.* at 633. Here, by stark contrast, the Government tendered a significant amount of evidence linking Zajac to the criminal element of the conspiracy; namely, the acceptance of bribes and kickbacks by public officials in exchange for favorable treatment of investment proposals pending before the Retirement Systems. As discussed, the Government elicited testimony from individuals on both sides of the conspiracy directly implicating Zajac. From the testimony of his co-conspirators–Beasley and Stewart–regarding their receipt of thousands of dollars personally delivered by Zajac, to the investment managers and third-party marketers he shook down on a regular basis, Zajac's fingerprints can be found on nearly every facet of the conspiracy. In sum, not only was Zajac acutely aware of the criminal objective, he worked diligently to expand its trajectory.  Accordingly, the Court finds that there were was more than sufficient evidence to support the jury's guilty verdict as to Zajac.

### c. Defendant Beasley

Beasley was convicted of four out of seven criminal counts contained in the Indictment. Specifically, the jury found him guilty of conspiracy to commit honest services fraud (Count 1), Hobbs Act extortion (Counts 2 and 4), and bribery (Count 7). In Beasley's post-trial Rule 29 motion, he argues that the evidence was insufficient to establish the essential elements of Counts 2 and 4. In other words, Beasley focuses exclusively on his convictions under the Hobbs Act.[2] The Court addresses each in turn.

---

[2] The Court notes that Beasley failed to articulate a sufficiency argument with respect to Count 1 in either of his Rule 29 motions. Moreover, while Beasley did lodge a sufficiency challenge to Count 7 in his original Rule 29 motion–incorporated here–he

14

As the Court instructed the jury, the essential elements of the crime of Hobbs Act extortion are, for purposes of Counts 2 and 4 of the Indictment: (1) that the defendant knowingly and wrongfully obtained money or other property from another person or persons; (2) that the defendant did so by means of extortion either under color of official right or by wrongful fear of economic harm; (3) that the defendant believed that the person or persons who were the subjects of the extortion would have parted with the money or property because of the extortion; and (4) that as a result of the extortion, interstate commerce was affected. (Trial Tr. Vol. 31, 39-40). *See Evans v. United States*, 504 U.S. 255, 268 (1992); *United States v. Gray*, 521 F.3d 514, 533-34 (6th Cir. 2008). More simply put, extortion under color of official right "occurs when a public official receives money or property to which the public official is not entitled, knowing the payment was in return for official action." (Trial Tr. Vol. 31 at 40). Worthy of particular note here, "it is not essential that a state official be able to guarantee a certain result before his acceptance of money to bring about that result will run afoul of the law. Reasonable prospects of success are sufficient." *United States v. Bibby*, 752 F.2d 1116, 1128 (6th Cir. 1985).

### (1)   Count 2: Extortion Under Color of Official Right–January 26, 2007 Birthday Party

Count 2 concerned Beasley's acceptance of $9,000 in cash delivered by Zajac at the "birthday" party taking place at the Atheneum hotel in January of 2007. Beasley's challenge to the sufficiency of the evidence focuses on the Government's alleged failure to show (1) that he was consciously aware of who contributed to the $9,000, and (2) that the cash was

---

failed to offer any new discussion in his post-trial submission. Accordingly, the Court finds no reason to depart from its original ruling with respect to Count 7. *See* (Dkt. 422, Mot. J. Acquittal Hr'g Trial Tr. 37-39).

given in exchange for official action. Contrary to Beasley's argument, there is sufficient evidence in the record from which the jury could have found that he had both knowledge of the purpose of the birthday party–and thus the scheme to defraud–and did, in fact, take official action on behalf of those who contributed to the $9,000 bounty.

As previously discussed, evidence at trial established that Zajac organized the birthday party for Beasley, collected $9,000 in cash from individuals having business with the Retirement Systems, and then delivered the cash to Beasley. None of these facts are controversial–Beasley openly admitted as much on the stand:

> Q. Well, the people at the party, your birthday party in January 2007, they were all connected to one or both of the Detroit pension funds, weren't they?
>
> A. Yes.
> ....
> Q. And as a trustee and treasurer of the city, you accepted thousands of dollars of cash from people connected with or who had business before the pension funds, didn't you?
>
> A. From a birthday party, yes.
> ....
> Q. And the cash in that envelope was handed to you by Ron Zajac, wasn't it?
>
> A. Yes, it was.

(Trial Tr. Vol. 29, 91-92). The question then becomes whether there was any evidence–circumstantial or otherwise–that those contributing to Beasley's gift did so in return for official action. The evidence on this score splintered in several supporting directions. First, there was the testimony of those individuals who admitted to contributing to the $9,000 gift. For example, Joseph Turner, an attorney with the Clark Hill law firm who regularly represented the Retirement Systems, testified that he contributed $500 in cash to Beasley's gift to ensure that his firm would remain counsel. (Trial Tr. Vol. 19 at 129). Chauncey Mayfield likewise testified that he gave money at Beasley's birthday party

16

because he was "simply covering my business as I've said all along." (Trial Tr. Vol. 12 at 29). Finally, there was the testimony of Chris Jackson, a third-party marketer on several deals before the Retirement Systems, who maintained that the gift "was something that had frankly become sort of a . . . protocol that different trustees over the years have had . . . ." (Trial Tr. Vol. 18, 12-13).   By following "protocol" Jackson hoped that the Trustees, including Beasley, would vote "in favor of [his] investments." *Id.* at 130. At a minimum, the circumstantial evidence overwhelmingly supports the inference that those who contributed to Beasley's gift expected some form of official *quid pro quo. See United States v. Sloman*, 909 F.2d 176, 179 (6th Cir. 1990) ("[t]he circumstantial evidence pointing to a conspiracy and scheme to defraud was clearly sufficient to require denial of the defendants' Rule 29 motions for acquittal and to support the jury's verdict.").

Nor does Beasley's testimony that he was unaware of who contributed to the $9,000 gift change this result. Indeed, where, as here, "some corroborative evidence of guilt exists for the charged offense and the defendant takes the stand in his own defense, the defendant's testimony, denying guilt, may establish, by itself, elements of the offense." *United States v. Ellisor*, 522 F.3d 1255, 1272 (11th Cir. 2004); *see also United States v. Williams,* 390 F.3d 1319, 1325 (11th Cir. 2004) ("Defendants in criminal trials are not obliged to testify. And a defendant who chooses to present a defense runs a substantial risk of bolstering the Government's case."). "This rule applies with special force where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge . . . . " *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995).   Here, Beasley testified that he was never told who contributed to the $9,000. As *Ellisor* makes clear, however, in light of the corroborative evidence offered by Turner,

17

Mayfield, and Jackson, the jury was free to weigh the credibility of Beasley's testimony and use it as substantive evidence of his guilt. In this way, Beasley's trial testimony presents an independent basis upon which to evaluate the sufficiency of the evidence in support of Count 2.

As established above, there was sufficient evidence in the record from which the jury could have determined that Beasley was guilty of extortion in connection with his receipt of $9,000 at the January 26, 2007 birthday party. The Court thus denies his motion for acquittal with respect to Count 2.

### (2)   Count 4: Extortion Under Color of Official Right–Cash Related to Syncom Investment

Count 4 of the Indictment charged Beasley with extortion related to his acceptance of cash kickbacks in connection with the Retirement Systems investment in Syncom, a venture capital firm represented by Terry Jones and Marc Cunningham. While Beasley does not contest the fact that he received multiple cash payments from Cunningham, he contends that "[t]hey were simply loans or paybacks consistent with a long-term relationship and course of conduct between the two of them." (Beasley Mot. 18). This belies the evidence.

In order for Beasley's argument to prevail, Cunningham's testimony must be unequivocal with respect to his motive. Herein lies the problem–even assuming the Court was not required to construe the evidence in a light most favorable to the Government–which it is–the record reveals, at a minimum, that Cunningham had mixed motives for making the payments. The following exchange portrays Cunningham's state of mind in this respect:

> Q. And so part of the reason that you wanted to give him money was out of

that friendship, is that correct?

A. Absolutely. It was the reason.

Q. Was another of the reasons that you gave money to Mr. Beasley because you felt he had helped with the Syncom deal?

A. Yeah, I mean, back of my mind, I felt, I mean, honored and, like, some sort of loyalty, you know, yes.

(Trial Tr. Vol. 16 at 120).  Cunningham continued to vacillate throughout his testimony, noting "[i]t would just be if I had some money in my pocket because of *that deal*, you know, I would [have] cash and . . . a couple dollars in my pocket.  And if I saw [Beasley], I would give him some . . . . " *Id.* at 117 (emphasis added).

As the Government correctly points out, the fact that Cunningham may have had mixed motives for making the payments is of no consequence. The Sixth Circuit has long held "that a state official's acceptance of money violates the Hobbs Act 'so long as the motivation for the payment focuses on the recipient's office.'" *Bibby*, 752 F.2d at 1127. Indeed, as the Court instructed the jury with respect to bribery and kickbacks generally, "people at times act with a mixture of motives. If the government proves beyond a reasonable doubt a payment was made in exchange for an official act, it is not required to prove that this was the only reason for the payment." (Trial Tr. Vol. 31 at 35). The Third Circuit, in *United States v. Bryant,* 655 F.3d 232, 246 (3d Cir. 2011), provided a helpful analogy in the context of honest services fraud. There, the defendant objected to the dual purpose aspect of the jury instructions permitting a finding of guilt "even if the jury believed Gallagher was partially motivated to pay Bryant for some legitimate work as well as his official action." *Id.* at 245-46. The court, rejecting the defendant's objection, explained as follows:

19

> The Appellants insinuate that this dual purpose test is similarly outside the core of honest services fraud. [*Skilling v. United States*, 561 U.S. 358 (2010)] did not so hold and we do not adopt that interpretation, as the consequences would be untenable. On Appellants' interpretation, a payor could bribe an official with impunity, intending to influence official action and vice versa, provided that the payor had some additional hope, however small, of receiving legitimate work in return.

*Id.* at 246.

The rationale employed in *Bryant* is equally applicable here. There is no dispute that Beasley voted in favor of several proposals ultimately inuring to the benefit of Syncom. *See* (Trial Tr. Vol. 16, 105-07). Cunningham testified that his payments to Beasley were motivated, at least in part, by these very same transactions. The fact that Cunningham and Beasley may have provided financial support to one another independent of this arrangement is of no consequence. Beasley cannot escape culpability on the grounds that his friendship with Cunningham preceded their illicit kickback scheme. Taken to its logical conclusion, this would require the Court to acquit every defendant convicted of Hobbs Act extortion where the giver attempts to tie the illegal kickback to some lawful purpose. Moreover, in light of the corroborative evidence discussed above, the jury was free–once again–to reject Beasley's testimony wherein he denied participating in a kickback scheme with Cunningham and use it as substantive evidence of his guilt. *See United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995).

Accordingly, the Court finds that there was sufficient evidence in the record to support Beasley's conviction of Hobbs Act extortion under Count 4 of the Indictment.

### 2. There Was No Constructive Amendment or Variance From the Indictment That Would Warrant Acquittal or a New Trial

Arguing separately–but raising many of the same substantive arguments–Stewart and Zajac maintain that, between the evidence produced at trial and the instructions given to

the jury, there was a constructive amendment or variance to the Indictment entitling them to an acquittal or a new trial. The Court thus considers Defendants' arguments in the context of both Rule 29 and Rule 33's "interest of justice" standard.[3]

"An indictment may be the subject of an actual amendment, a constructive amendment, or a variance." *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007). Thus, constructive amendments and variances are "two types of 'modifications to indictments that have been recognized by'" the Sixth Circuit. *United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008) (internal citations omitted).

A constructive amendment "results when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *United States v. Martinez*, 430 F.3d 317, 338 (6th Cir. 2005). Constructive amendments are "per se prejudicial because they infringe on the Fifth Amendment's grand jury guarantee." *Kuehne*, 547 F.3d at 683 (internal citations and quotations omitted). "Because of the constitutional injury that results from a constructive amendment, when proven, a defendant is entitled to a reversal of his conviction." *Id.*

A variance, on the other hand, is not *per se* prejudicial. *Id.* "Rather, reversal is warranted only where a defendant proves that (1) a variance occurred and (2) that the variance affected a substantial right of the defendant." *Id.* (quoting *United States v. Prince*, 214 F.3d 740, 757 (6th Cir. 2000)). "A variance occurs when the charging terms of the

---

[3] Under Rule 33 of Federal Criminal Procedure, "[a district] court may vacate any judgment and grant a new trial if the interest of justice so requires."

21

[indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United States v. Chilingirian*, 280 F.3d 704, 711 (6th Cir. 2002) (quotations omitted). The substantial rights of the defendant "are affected only when the defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *Kuehne*, 547 F.3d at 683 (citations and quotations omitted). The defendant bears the burden of proving whether a constructive amendment or variance has occurred. *Id.*

While the distinction between these categories can be murky, the consequences of each are drastically different. Indeed, "[a] defendant who proves a constructive amendment is . . . entitled to a reversal of his or her conviction, whereas a defendant who establishes only that a variance has occurred must further demonstrate that his or her substantial rights have been affected." *Chilingirian*, 280 F.3d at 712. In addition, while "defendants can establish a variance by referring exclusively to the evidence presented at trial, [they] cannot demonstrate a constructive amendment–which is *per se* prejudicial–without proof that the important functions of an indictment were undermined by both the evidence presented and the jury instructions." *United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006). As the foregoing makes clear, this distinction is especially important where, as here, Defendants rely on essentially the same reasoning in support of their arguments in favor of a variance and constructive amendment.

The Court begins by addressing Defendants' shared arguments concerning the alleged disparity between the Indictment, the jury instructions, and the evidence presented at trial. Along these lines, Defendants raise three distinct yet equally untenable arguments. First, they suggest that the Government wrongfully "indicated that just one single

deprivation of honest services–involving an agreement related to just one transaction involving just one trustee or representative–was sufficient for a finding of guilt." (Stewart Rule 33 Mot. at 3).  Next, they maintain that the Government failed to establish that each Defendant was connected to the broad conspiracy alleged in the Indictment. Finally, consistent with the "multiple conspiracies" theory, Defendants argue that they were prejudiced by "a spillover of evidence from one conspiracy to another . . . ." (Zajac Mot. at 11). Along the way, the Court considers a number of independent arguments raised by Stewart related to the broader context in which this challenge arises.

### a.  The Government Was Not Required to Prove That Defendants Were Involved in Every Aspect of the Conspiracy

Defendants' first argument, at its core, is relatively straightforward: the Government failed to adequately prove that Stewart and Zajac were intimately involved with all facets of the conspiracy alleged in Count 1. As the Supreme Court has made abundantly clear, however, Defendants' argument misapprehends a very basic tenet of conspiracy law. Indeed, "[s]ecrecy and concealment are essential features of a successful conspiracy. Hence the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Blumenthal v. United States*, 332 U.S. 539, 557 (1947). In other words, "it is enough that the government present evidence that, if believed, proved that the defendant knew of the conspiracy's general scope and sought its common end." *United States v. Little*, 173 F.3d 857 (6th Cir. 1999) (Table) (quotation and alteration omitted).

Here, as the Court has discussed in great detail, there was a plethora of evidence not only linking Defendants to the common aim of the conspiracy, but actively contributing to

its success. *See United States v. Warshak*, 631 F.3d 266, 310 (6th Cir. 2010) (finding sufficient evidence based on defendant's presence at meetings where conspiracy discussions took place and trust-relationship that she established with one of the conspirators). Indeed, the record is replete with examples of Stewart accepting cash and other things of value from individuals actively seeking his vote of approval on various investment opportunities. Likewise, there was extensive evidence that Zajac served as the quarterback of the scheme; facilitating the payment of bribes and kickbacks in order to secure his continued employment with the Retirement Systems. In sum, Defendants' participation in the conspiracy far exceeded the requirements set forth in *Blumenthal* and its progeny.

Nor does Stewart's reliance on *United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004) suggest that the result should be any different. There, the indictment charged a single "hub and spoke" conspiracy alleging that Jacobson, the principle figure, stole Monopoly game stamps and then constructed a vast network of co-conspirators who would redeem the stamps and recruit others. *Id.* at 806. "Unlike the classic hub-and-spoke conspiracy, however, Jacobson was the only conspirator in the hub, and when he moved from spoke to spoke, he moved alone. There was no time at which he and another conspirator moved from spoke to spoke." *Id.* The fatal error in *Chandler*, therefore, was the Government's concession that none of the "spokes knew [anything] about each other or, indeed, about Jacobson's theft of the game stamps and his overall scheme." *Id.* at 808. Without knowledge of the underlying criminal object or the existence of the broader plan to which they were a part, the defendants' participation was insufficient to link them to the

conspiracy.  As the court ultimately held, this "was [an] error of constitutional proportion." *Id.*

Chandler is easily distinguishable from the facts giving rise to Defendants' conviction. First and foremost, this case does not involve a "hub and spoke" conspiracy. Moreover, the evidence was clear that Defendants were both aware of the overall scheme and worked in concert to ensure its primary goal–the solicitation and receipt of bribes and kickbacks from individuals with business before the Retirement Systems–was achieved. In fact, much of the evidence concerning the investor sponsored trips and related cash payments occurred while Defendants were traveling together in various states. The testimony was clear that this dynamic became ingrained in the culture of doing business with the Retirement Systems. As such, the Court is left with little doubt that Defendants' conduct in this relatively isolated environment was well-known to all involved.

In a similar vein, Stewart suggests that, contrary to the jury instructions provided by the Court, the Indictment required the Government to prove that each Defendant was involved in unlawful activity pertaining to the honest services of all six public officials listed in Count 1. Interpreting the Indictment in this manner flies in the face of well-established Sixth Circuit precedent that "an offense may be charged conjunctively in an indictment where a statute denounces the offense disjunctively." *United States v. Pritchett,* 749 F.3d 417, 429 (6th Cir. 2014) (citations omitted).

In *Pritchett*, the defendants were charged with, *inter alia*, conspiracy to possess pseudoephedrine and iodine with knowledge that the chemical would be used to manufacture methamphetamine. *Id.* at 428. Though the indictment listed pseudoephedrine *and* iodine, the court instructed the jury that they could find defendants guilty if they found

them to possess either chemical. *Id.* The defendants challenged this instruction as a constructive amendment to the indictment.  The court, relying on *United States v. LaPointe*, 690 F.3d 434, 440 (6th Cir. 2012), wholeheartedly disagreed, explaining that:

> [t]he government's right to charge in the conjunctive and prove in the disjunctive reflects the necessary discrepancies between indictments and jury instructions. Indictments must be phrased in the conjunctive so that society can be confident that the grand jury has found probable cause for all of the alternative theories that go forward. Juries, on the other hand, may convict a defendant on any theory contained in the indictment. As a result, judges read jury instructions in the disjunctive.

*Pritchett*, 749 F.3d at 429.

Similarly here, the Government's decision to charge in the conjunctive does not change the fact that 18 U.S.C. § 1343 is phrased in the disjunctive. Indeed, § 1343 applies to anyone "having devised or intend[ed] to devise *any* scheme or artifice to defraud . . . ." (emphasis added). Likewise, Count 1 charged Defendants with "conspir[ing] with each other and others to devise a scheme to defraud present and retired employees of Detroit . . . of their right to the honest services of Kwame Kilpatrick, Jeffrey Beasley, Paul Stewart, Martin Bandemer, James Moore, and George Stanton through bribery and kickbacks." (Trial Tr. Vol. 31 at 23). Read together, *Pritchett* is clear that the Court was free to instruct the jury that the Government need only prove that "the defendants conspired to deprive the participants and beneficiaries of the retirement systems of their right to the honest services of *one or more trustees or* their representative by means of bribes or kickbacks." (*Id.* at 30-31) (emphasis added). Under these circumstances, "the government may prove and the trial judge may instruct in the disjunctive form used in the statute." *Pritchett*, 749 F.3d at 429.

26

In the alternative, Stewart maintains that the Court's instruction permitting a finding of guilt as to the deprivation of honest services of only one of the listed officials changes the "core of criminality," charged in Count 1. Even assuming, *arguendo*, that there was a material difference between the Indictment and the jury instructions, this argument fails to persuade the Court that the end result would be any different.

The "core of criminality" of an offense, as defined by the Second Circuit decision relied upon by Stewart, "involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview." *United States v. D'Amelio*, 683 F.3d 412, 421 (2d Cir. 2012) (concluding that the indictment put the defendant on "notice of the core criminal conduct for which he was charged."). The key question here is whether the deprivation of honest services of only one of the listed officials was "encompassed in the 'core of criminality' charged in the indictment . . . .'" *Id.* at 422. The answer to this question is yes. The single "essence" of Count 1 is clearly the deprivation of honest services of public officials via bribes and kickbacks. In other words, as the jury instructions made clear, the number of listed officials does not impact the "core of criminality" in anyway.   Moreover, there is no evidence, much less any argument, that Stewart was surprised by any of the evidence introduced against him. *See id.* As such, this argument likewise fails.

### b.   Defendants Were All Members of the Same Conspiracy

Defendants next contend that the Government failed to tie each individual Defendant to the same conspiracy charged in the Indictment. This argument is equally unconvincing. "Within the context of a conspiracy, a variance constitutes reversible error only if a defendant demonstrates that he was prejudiced by the variance and the indictment alleged

27

one conspiracy, but the evidence can be construed *only* as supporting a finding of multiple conspiracies." *United States v. Robinson*, 547 F.3d 632, 642 (6th Cir. 2008) (citations and quotations omitted) (emphasis in original). Moreover, "[a] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *Id.* (citations omitted). A defendant "must prove the evidence *must* support the conclusion that two conspiracies occurred," *United States v. Peatross*, 377 F. App'x 477, 486 (6th Cir. 2010) (emphasis in original). In making this determination, "the evidence must be viewed in the light most favorable to the government." *Robinson*, 547 F.3d at 642.

In essence, Defendants argue that the Government "presented a series of transactions that [were] separate and distinct actions which frame[d] different agreements . . . ." (Zajac Mot. 10). In support of this proposition, Zajac claims that the Government failed to present any evidence linking him "with anything Kwame Kilpatrick was engaged in"; "to any participation or knowledge of what Defendant Dixon was engaged in"; or with "what Defendant Stanton accepted as bribes or was otherwise engaged in." (*Id.* at 8-9). Notwithstanding the evidentiary problems posed by this argument–which the Court has discussed on several prior occasions–Defendants ignore yet another fundamental aspect of conspiracy law; namely, that "to prove a single conspiracy, the government need only show that each alleged conspirator had knowledge of and agreed to participate in what he knew to be a collective venture directed toward a common goal." *Robinson*, 547 F.3d at 642 (citations and quotations omitted). Not only did the evidence show that Zajac was in fact involved with Kilpatrick, Dixon, and Mayfield in the conspiracy, there was substantial

28

evidence linking Defendants to a collective venture–soliciting and accepting bribes and kickbacks from individuals doing business with the Retirement Systems–with the common goal of providing financial remuneration to all involved. Defendants did not and seemingly cannot address this very basic problem without arriving at a similar conclusion.

Moreover, the Supreme Court, in *Blumenthal v. United States*, 332 U.S. 539 (1947), rejected a similar challenge where the evidence portrayed a far more tenuous connection between the defendants and their illicit activity. In *Blumenthal*, five defendants were convicted of conspiracy to sell whiskey at prices above a control ceiling. There were two central figures and three distributors. The distributors worked independently of each other and were often unaware of who coordinated the individual sales, yet the Court treated all five as being part of a single agreement, stating:

> [a]ll knew of and joined in the overriding scheme. All intended to aid the owner, whether Francisco or another, to sell the whiskey unlawfully, though the two groups of defendants differed on the proof in knowledge and belief concerning the owner's identity. All by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in disposing of the whiskey.

*Id.* at 559. Similarly here, even accepting the factual premise of Zajac's argument as true, the jury was not precluded from finding a single conspiracy. Indeed, there is no doubt that Defendants knew of the scheme's general scope and sought a common end. Thus, the evidence was sufficient to support the Government's single conspiracy theory of the case.

Additionally, the Court's instructions to the jury on multiple conspiracies made it clear that the Government was required to prove that each of the Defendants was a member of the single conspiracy charged in the Indictment:

> [t]o convict any of the defendants of the conspiracy charge, the government must convince you beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment. If the government fails

29

> to prove this, then you must find the defendant not guilt of the conspiracy
> charge, even if you find that he was a member of some other conspiracy.

(Trial Tr. Vol. 31 at 27). The Court likewise noted that the "government must prove that [a defendant] knew the conspiracy's main purpose, and that he voluntarily joined it intending to help advance or achieve its goals." (*Id.* at 26); *See Blumenthal*, 332 U.S. at 557 ("the law rightly gives room for allowing the conviction of those discovered upon showing . . . the essential nature of the plan and their connection with it . . . [o]therwise . . . conspirators would go free by their very ingenuity"). As such, the Court is satisfied that the jury instructions adequately served as an additional layer of protection to prevent any prejudice from being visited on Defendants. Furthermore, as the Government highlights in its response, the jury was provided with a copy of the Indictment to ensure that they were aware of the specific factual basis pled in support of the conspiracy. The Court "therefore uphold[s] the jury's determination that a single conspiracy existed, as well as the jury's finding that all three defendants participated in the conspiracy to a greater or lesser extent." *United States v. Davenport*, 808 F.2d 1212, 1215 (6th Cir. 1987) ("[T]he government is not required to prove an actual agreement among the various conspirators in order to establish a single conspiracy.").

Finally, the Court need only give passing treatment to Defendants' suggestion that their substantial rights were affected by a spillover of evidence from one conspiracy to another. Indeed, Defendants have failed to substantiate the very premise this argument depends on; namely, the existence of multiple conspiracies. Moreover, Defendants' reliance on *Kotteakos v. United States*, 328 U.S. 750 (1947) illustrates precisely why this principle has no application here. There, the indictment named thirty-two defendants, nineteen of whom went to trial. *Id.* at 753. On appeal, the Government admitted the

evidence established not one, but eight or more conspiracies, all revolving around one central figure. *Id.* at 752. This concession left the Court only to consider whether the defendants had suffered substantial prejudice. *Id.* Here, the Government has made no such concession–for good reason–and the Indictment named only six Defendants, all of whom were easily linked to the same core of criminality.

Additionally, even assuming the evidence did plausibly support the existence of multiple conspiracies, the Sixth Circuit has been clear that "a variance in a conspiracy case is harmless where proof of the acts committed in furtherance of both conspiracies [i]s not likely to confuse the jurors and cause them to transfer guilt from one defendant to another across the line separating the conspiracies." *United States v. Osborne*, 545 F.3d 440, 444 (6th Cir. 2008). Here, all of the evidence revolved around the same people, institutions, and general course of conduct. Under these circumstances, there is very little–if any–risk of juror confusion. Therefore, Defendants' argument concerning multiple conspiracies is factually and legally devoid of merit, and there has been no showing of substantial prejudice.

### c.    Defendants' Substantial Rights Were Not Prejudiced by the Introduction of Evidence Beyond the Named Trustees

Finally, Stewart makes much to do about the prejudicial nature of certain statements that were not specifically related to his individual participation in the conspiracy. By way of example, Stewart points to several passing references by the Government to the "Trustees" as a group. *See e.g.,* Trial Tr. Vol. 33, 45-49; ("Thousands of dollars in expenses to keep the **trustees** happy, none of this ever being disclosed to the pensioners.") *Id.* at 45; ("Zajac was willing to shower the **trustees** with cash . . . .") *Id.* at 49; ("Zajac and the **trustees**, they wanted to force Wayne to pay for another trip to London to get another 10 million.") *Id.*

Stewart appears to be insinuating that the Government's statements improperly suggested that he could be found guilty for the actions of the "Trustees"–many of whom were not named in the Indictment. This argument fails for a number of reasons.

First, it is not uncommon for facts that are only tangentially related to a defendant's guilt or innocence to come in during the course of trial. In the context of a variance or constructive amendment, the propriety of this extraneous information is judged in relation to the facts pled in the indictment. As the court aptly surmised in *United States v. Kuehne,* 547 F.3d 667, 686 (6th Cir. 2008), "the presentation of additional evidence to substantiate charged offenses, however, does not constitute [a variance unless the] facts [are] materially different from those charged in the indictment." There, the Government presented evidence that the defendant had participated in the theft of over 200 firearms beyond those specifically described in the indictment. *Id.* at 676. The court denied the argument that this additional evidence constituted a variance for three reasons: (1) it was not materially different from the charges set forth in the indictment; (2) the jury was instructed that it must find that the weapons identified in the indictment were involved in the offense; and (3) the defendant failed to show substantial prejudice. *Id.* at 686-87; *see also United States v. Robison*, 904 F.2d 365, 369 (6th Cir.1990) (finding that discrepancy between the type of gun alleged in the indictment and the type of gun described in jury instruction did not constitute a variance because the defense offered at trial was "not substantially affected by the particular type of firearm with which he was convicted of having involvement").

Stewart's argument fails for precisely the same reasons articulated in *Kuehne.* As a preliminary matter, all of the statements he identifies were directly related to the scheme pled in the Indictment. In fact, the bulk of the "improper" references were nothing more than

32

a general summary of the illicit benefits Defendants received in connection with their participation in the conspiracy. On this record, there is simply no logical basis to conclude that this information was somehow materially different from the charges set forth in the Indictment. Furthermore, to the extent that there was any danger of guilt by association, the Court's instruction to the jury adequately remedied this issue:

> [t]he defendants have all been charged with one charge in Count 1. But in our system of justice, guilt or innocence is personal and individual. It is your duty to separately consider the evidence against each defendant and to return a separate verdict for each one of them. For each defendant, you must decide whether the government has presented evidence proving that . . . particular defendant guilty beyond a reasonable doubt. Your decision on any one defendant or charge, whether it is guilty or not guilty, should not influence your decision on any of the other defendants or charges.

(Trial Tr. Vol. 31, 21-22). Finally, even assuming that the Government's statements did constitute a variance, Stewart has not–and on these facts cannot–demonstrate that such a variance affected his substantial rights. As discussed, the substantial rights of the defendant "are affected only when the defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *United States v. Barrow*, 118 F.3d 482, 488–89 (6th Cir. 1997). Stewart offers nothing to indicate how the Government's statements rise to this level of prejudice.

### 3.    Statute of Limitations

Finally, Zajac argues that he is entitled to an acquittal on the grounds that the Government failed to present any evidence of illicit conduct occurring outside the five year statute of limitations applicable to Count 1. The Court has previously rejected this argument on at least two occasions and finds no reason to revisit its ruling based on the arguments set forth here. Accordingly, the Court DENIES Zajac's statute of limitations argument for

the reasons previously stated. *See* (May 8, 2014 Opinion and Order, Dkt. 209, 2-7; Trial Tr. Vol. 26, 57-59).

### C. Conclusion

For the above-stated reasons, Defendants have failed to satisfy their Rule 29 burden in support of acquittal.

The Court now turns to Defendants' Rule 33 motions for a new trial.

## III.  Rule 33 Motions for a New Trial

Defendants next argue–in the alternative–that they are entitled to a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. The crux of Defendants' legal challenges in this context fall into two categories. First, they argue that the Government's remarks during opening and closing argument violated their right to a fair trial. Second, Zajac contends that the Court erred by permitting certain recorded phone calls into evidence. In addition to these specific challenges, Defendants lodge one of the same arguments previously addressed under the Rule 29 framework; namely, that the evidence was insufficient to establish the essential elements of the crimes. As noted below, the Court disposes of this argument in summary fashion for the same reasons previously articulated. Finally, as mentioned, the Court has already considered Stewart's constructive amendment/variance argument in the context of both Rule 29 and 33, and declines to readdress it here.

### A. Standard of Review

A motion for a new trial is governed by Rule 33 of the Federal Rules of Criminal Procedure. That Rule provides that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R.

Crim. P. 33(a). "The rule does not define interest of justice and the courts have had little success in trying to generalize its meaning." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (internal quotation marks and citation omitted). It is, however, "widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *Id.* This would include "reversible error or violation of the defendant's substantial rights." *Id.* at 374.

Defendants also seek a new trial on the basis that the jury's verdict is against the weight of the evidence. As the Sixth Circuit recently observed, "[i]n deciding Rule 33 motions based on the manifest weight of the evidence, . . . a district judge may sit as a thirteenth juror and consider the evidence to ensure that there is no miscarriage of justice." *Id.* at 373 n. 9. "Generally, such motions are granted only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *United States v. Montgomery*, 358 F. App'x 622, 628 (6th Cir. 2009) (internal quotation marks and citations omitted).

### B.  Analysis

#### 1.   Defendants' Arguments Challenging the Sufficiency of the Evidence Fare No Better Under Rule 33

As mentioned, Defendants attempt to reassert their sufficiency arguments in the context of a Rule 33 challenge. This is unavailing for a number of reasons. First, the Court rejects the notion that Defendants' convictions represent one of those extraordinary circumstances where the evidence preponderates heavily against the verdict. To the contrary, the Court has already addressed and rejected Defendants' arguments that the

35

evidence at trial was not only sufficient to sustain their convictions, it weighed heavily in support of the verdicts of guilt.  Moreover, Defendants fail to identify any specific reason why, when viewed under the framework set forth in Rule 33, the evidence should be viewed any differently.

Accordingly, the Court rejects this challenge for the same reasons previously articulated. The Court now considers Defendants' arguments that substantial legal or reversible errors warrant a new trial.

### 2. Defendants Are Not Entitled to a New Trial Based on Claims of Legal or Reversible Error

#### a. The Prosecutors' Remarks Did Not Violate Defendants' Right to a Fair Trial

Beasley and Zajac, arguing separately, move for a new trial on the basis that the Government engaged in prosecutorial misconduct by seeking "to inflame an emotional response from the jury." (Beasley Mot. 23). Defendants' argument stems from a number of isolated comments made by the Government during the course of its closing and rebuttal arguments. The Court, upon considering each of the statements referenced by Defendants, finds that the Government's remarks fall far short of the "flagrant" variety held by the Sixth Circuit to be violative of a defendant's right to due process.

The Supreme Court has long recognized "that the adversary system permits the prosecutor to prosecute with earnestness and vigor" and has cautioned that although the prosecutor "may strike hard blows, he is not at liberty to strike foul ones." *United States v. Young*, 470 U.S. 1, 7 (1985) (internal quotation marks and citations omitted). The same applies to defense counsel. As the *Young* Court observed, "counsel on both sides of the table share a duty to confine arguments to the jury within proper bounds. Just as the

36

conduct of prosecutors is circumscribed, the interests of society in the preservation of courtroom control by the judges are no more to be frustrated through unchecked improprieties by defenders. Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case." *Id.* at 8 (internal quotation marks and citations omitted).

In deciding whether a prosecutor's remarks rise to "prosecutorial misconduct" requiring a new trial, the Supreme Court has acknowledged that "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted). Rather, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation marks and citation omitted).

Applying these legal principles, the Sixth Circuit has adopted a two-part test for evaluating motions based upon prosecutorial misconduct. *United States v. Wettstain*, 618 F.3d 577, 589 (6th Cir. 2010). A mistrial or new trial will be granted only after determining whether the prosecutor's remarks are improper and flagrant. "Improper remarks that are flagrant amount to *per se* reversible error; improper remarks that are not flagrant may amount to reversible error in certain circumstances." *Id.* (internal quotation marks and citation omitted). "To determine the flagrancy of the prosecutor's remarks," the following factors are considered: "(1) whether the statements tended to mislead the jury and prejudice the defendant; (2) whether the statements were isolated or pervasive; (3) whether the statements were deliberately placed before the jury; and (4) whether the evidence against the accused is otherwise strong." *Id.* (internal quotation marks and citation omitted).

The isolated comments identified by Defendants were not improper–and far from flagrant–and thus fail to clear the first hurdle for obtaining a new trial. Beginning with Beasley, his challenges can be distilled into three categories. First, he takes issue with a number of remarks made by the Government that were "designed to strike a personal chord with the jurors." (Beasley Mot. 21). In this category, Beasley objects to the Government's identification of the individuals adversely affected by Defendants' actions, which included "clerks, bus drivers, police officers, accountants, firefighters, the surviving spouses of police officers and firefighters who died in the line of duty." (Trial Tr. Vol. 32 at 18). Along these same lines, Beasley takes issue with the Government's statement that "people like Rena Presbitero, they took their salaries and they counted on a pension when they would be able to retire . . . ." *Id.* Finally, the Government concluded its theme of personalizing the victims by repeating the rhetorical question "Who was taking care of the pensioners?"

The Court is hard-pressed to find anything improper with the "personal chord" line of commentary. With respect to the Government's identification of those defrauded by Defendants' scheme, that was merely a factual statement describing some of the participants and beneficiaries in the Retirement Systems. Likewise, the brief reference to Rena Presbitero–a witness called by the Government who testified about the wire transfers she processed on the corrupt investments–was factual in nature and in no way designed to illicit an emotional response from the jury. *See Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (denying the defendant's argument that the following statement made by the prosecutor was improper: "Ask yourself if you had a loved one, or had a relative, or a friend, who was in a situation like that.") As for the Government's use of a rhetorical device to put

the pensioners vulnerability in perspective, "[c]ase law makes clear that nothing prevents the government from appealing to the jurors sense of justice," which, at worst, is precisely what the Government was attempting to do here. *United States v. Johnson*, 583 F. App'x 503, 509-10 (6th Cir. 2014) (internal citations and alterations omitted).

Beasley also attacks the Government's statement that "we also don't know what would have happened if the trustees had invested the money wisely instead of corruptly." (Trial. Tr. Vol. 32 at 19). Once again, without drawing on any authority questioning the propriety of a similar statement, Beasley makes the generic argument that this remark "sought to inflame an emotional response from the jury out of sympathy for pensioners . . . ." (Beasley Mot. 23). As the Government makes clear, however, the purpose of this statement was to undercut Defendants' suggestion–though cross-examination–that certain investments involved in the scheme were profitable for the Retirement Systems. In this way, the "prosecutor's remarks were invited, and did no more than respond substantially in order to right the scale[.] [S]uch comments would not warrant reversing a conviction." *United States v. Henry*, 545 F.3d 367, 381 (6th Cir. 2008).

Finally, Beasley suggests that the Government inappropriately implied that "pensioners' monthly payments were reduced . . . as a result of . . . actions taken by . . . defendants." (Beasley Mot. 22). The Court is unable to find, and Beasley has failed to provide, any passage from the Government's closing that fairly supports this implication. Moreover, to the extent that Beasley is challenging the Government's discussion of investment losses suffered by the Retirement Systems as a result of the scheme, there was significant testimony on this topic during the course of trial. *See e.g.,* (Trial Tr. Vol. 25, 45-

39

46). As such, the Government was free to revisit the subject at closing. Accordingly, the Court finds Beasley's objections to the Government's comments to be wholly without merit.

Nor do Zajac's challenges fare any better. First, he argues that the Government violated a fundamental principle of criminal law by suggesting to the jury that "[w]e don't need to prove anything." (Trial Tr. Vol. 32 at 21). The context surrounding this statement–which Zajac conveniently omits–reveals that there was nothing improper about this particular remark:

> Also keep in mind what we do not have to prove for the conspiracy . . . We [] don't have to prove that the conspiracy existed during the entire time alleged in the indictment. And a defendant doesn't have to be involved from the very beginning to the end. Just so long as that defendant was involved at some point during the conspiracy, joined in the agreement.
>
> We also don't have to show that the scheme actually succeeded. We only need to show the agreement and that the defendant joined in the agreement. Those are the two elements we need to prove.
>
> We also don't need to prove every disputed fact. You've heard plenty of disputed facts. **We don't need to prove anything**. We only need to show those two elements.

*Id.* at 20-21. In other words, the Government's statement was simply a pedestrian reaffirmation of the universally accepted view that the Government is only obligated to prove the essential elements of the crime–not every disputed fact.

Next, Zajac takes issue with two statements that were clearly supported by the evidence at trial. For example, he claims that the Government grossly misstated his role in the birthday parties by suggesting that "Zajac was the one person who invited the guests, told them to bring money." (Trial Tr. Vol. 32 at 26). However, as the Court has discussed throughout this Opinion and Order, the evidence at trial demonstrated that Zajac was the primary, if not sole, motivating force behind the birthday parties. Indeed, several witnesses

40

testified to this effect. *See e.g.,* Trial Tr. Vol. 19, 32, 40 (Turner: Zajac "said he, that he was asking for $500 per trustee," Zajac "asked me to make a contribution"); Trial Tr. Vol. 15, 30, 42-43, 69 (Thomas Zdrodowski); Trial Tr. Vol. 21 at 6 (Roy Dixon: Zajac "organized the party"; Dixon gave cash to "garner favor" with Zajac, Stewart, and Bandemer); Trial Tr. Vol. 18 at 10 (Chris Jackson: Zajac invited him to the party and requested "I believe around $500 for the event."). Likewise, Zajac's objection to the Government's statement concerning the "illegal and improper nature of Zajac's demand for a third trip to London . . . ." is also without merit. (Trial Tr. Vol. 32 at 48). Indeed, as previously discussed, the recorded phone conversations between Bernard Kilpatrick and Michael Wayne establish precisely what the Government alluded to during closing; namely, that Zajac was demanding that Wayne sponsor a third trip to London in exchange for an additional $10 million in connection with the CROCI investment. *See* (Gov't Ex. CROCI 23). In sum, there was ample evidence to support both of the Government's statements in this regard, and thus no valid claim of prosecutorial misconduct.

Finally, Zajac takes exception to the Government's use of the term "greed" to characterize his motive in this case. The Government produced a significant amount of circumstantial evidence suggesting that Zajac's primary motivation in participating in the bribery scheme was to obtain a raise and secure his continued employment as general counsel to the Retirement Systems. Indeed, Zajac's salary was increased over 33% in the same year as Beasley and Stewart's infamous "birthday parties"– which he organized and facilitated. Zajac resisted this implication, vigorously arguing that his raise was commensurate with the market value of his services. At a minimum, then, the Government's suggestion that Zajac "helped to pay those bribes because of his own

greed," (Trial Tr. Vol. 32 at 17), falls within a prosecutor's "wide latitude during closing argument to respond to the defense's strategies, evidence and arguments." *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009); *see also United States v. Shalash,* 108 F. App'x 269, 280 (6th Cir. 2004) ("The references to the Shalashes 'getting rich' and having 'extra money' permissibly highlighted their illegally-obtained wealth and their abuse of corporate power . . . ."). As such, the Court is not persuaded that the Government's remarks concerning Zajac rise to the level of prosecutorial misconduct.

Moreover, even assuming, *arguendo*, there was some slight prejudice stemming from the Government's commentary in this case, the Court's instructions to the jury were clear that (1) the lawyers' arguments were "not evidence", and (2) the jurors "must make [their] decisions based only on the evidence that [they] saw and heard here in court." (Trial Tr. 31 at 17); *United States v. Roberts*, 986 F.2d 1026, 1032 (6th Cir. 1993) (declining to address the merits of the defendant's prosecutorial misconduct argument where the court instructed the jury that "[y]ou must make your decision based only upon the evidence that you saw and heard here in court."). In sum, there is simply no way the isolated remarks identified by Defendants "could be deemed to have been so 'exceptionally flagrant' or 'so pronounced and persistent that it permeated the entire atmosphere of the trial . . . .'" *United States v. Gonzalez*, 512 F.3d 285, 292 (6th Cir. 2008) (citations and quotations omitted). Accordingly, the Court must, and does, DENY Defendants' challenges in this regard.

### b.    Wiretapped Phone Recordings

Finally, Zajac argues that he is entitled to a new trial on the basis that the Court erred by admitting wiretapped phone calls between Michael Wayne and Bernard Kilpatrick into evidence. The Court thoroughly considered this issue when it was originally raised during

42

trial and determined, *inter alia*, that the phone recording was "admissible as co-conspirator statements in furtherance of the conspiracy" under Federal Rule of Evidence 801(d)(2)(E). (Trial Tr. Vol. 24, 20-22, 25). The Court then revisited the issue the following day to hear any supplemental arguments and again denied Zajac's objection. (Trial Tr. Vol. 25, 5-7). Here, Zajac merely repeats the same argument that the Court previously considered and denied.  Finding no reason to disturb its original ruling, the Court stands by its decision to DENY Zajac's objection to the wiretapped phone recordings for the reasons previously stated.

Accordingly, Defendants' Rule 33 motions for a new trial are DENIED.

**C. Conclusion**

For the above-stated reasons, Defendants' Rule 29 and Rule 33 motions are hereby DENIED.

SO ORDERED.

s/Nancy G. Edmunds_____
Nancy G. Edmunds
United States District Judge

Dated:  April 16, 2015

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 16, 2015, by electronic and/or ordinary mail.

s/Carol J. Bethel_____
Case Manager