UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                            Case No. 12-cr-20030

v.                                  HON. NANCY G. EDMUNDS

JEFFREY BEASLEY,

      Defendant.
_____/

## THE UNITED STATES' RESPONSE TO DEFENDANT'S MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE

After serving less than five years in prison and about three years on home confinement, of an original 11-year sentence (a sentence that was later reduced to time served), Defendant Jeffrey Beasley asks this Court to cut him another break and terminate his supervised release early, having served only half of his term of supervised release. The Court should deny his request. Beasley still owes more than $396,000 in restitution. Simply put, he has not shown that his conduct and the interest of justice warrant early termination of supervision.

## Factual Background

Following a jury trial, Beasley was convicted of conspiracy to commit honest services mail and wire fraud, two counts of interference with commerce by extortion, and acceptance of bribes. (ECF No. 515, PageID.9020).

Page **1** of **14**

In January 2006, Beasley became Treasurer for the City of Detroit and a Trustee of both of Detroit's pension systems. (PSR ¶ 17). Beasley used his positions as Treasurer and Trustee to corruptly make money for himself through his oversight of billions of dollars. Beasley made decisions not based on the best interests of the pensioners or the pension systems but based on his own greed and the greed of his fellow trustees who joined in the conspiracy. The Detroit pension systems lost millions of dollars because of Beasley's corrupt decisions.

While serving as Treasurer and Trustee, Beasley accepted and demanded bribes and kickbacks in exchange for his vote and his influence over other votes. These bribes and kickbacks were paid by third party marketers, investment sponsors, and contractors to Detroit's pension systems.

For example, in 2007, the Detroit pension systems invested $44 million in the ICG Leaseback deal in which the investment sponsor structured the lease-back purchase of five warehouses from General Motors. Aware that the investment sponsor had agreed to pay off others, Beasley demanded $250,000 in exchange for his help getting the deal approved by the pension boards. The investment sponsor subsequently made periodic payments to Beasley totaling approximately $70,000 in cash. The investment sponsor gave other bribes to Beasley too, including: (1) a trip to Miami Beach for Beasley and his girlfriend; (2) multiple nights at the Atheneum Hotel for Beasley and his mistress; (3) meals, drinks, and entertainment in Detroit

and elsewhere; and (4) multiple contributions to the Kilpatrick Civic Fund. In return, Beasley went to work for the investment sponsor (rather than the best interests of the pensioners or the pension systems). Beasley engineered votes to support the best possible deal for the investment sponsor but the worst possible deal for the pension systems. Because of Beasley's actions, the retirement systems paid over $1 million in fees for which the investment sponsor would otherwise have been responsible. Additionally, the ICG Leaseback deal was bad for the pension systems because it involved loaning money to General Motors at a time when the financial industry had recognized that General Motors was in a terrible financial position. Eventually, as a result of the General Motors bankruptcy, the Detroit pension systems were forced to take an even worse rate of return from General Motors.

Beasley also accepted bribes and kickbacks from Jim Papas, who had a financial stake in several transactions involving the pension boards. Beasley admitted he received thousands of dollars in casino chips from Papas on occasions when Beasley was at the casino with Papas. Papas was also involved in wining and dining Beasley and other trustees following pension board meetings at Papas' restaurants. In return, Beasley supported Papas' investments, which resulted in hefty six-figure commissions for Papas.

Beasley accepted bribes and kickbacks from Chauncy Mayfield. Mayfield's company earned millions in commissions and fees from the two pension systems,

and Mayfield personally earned a salary and bonuses of over $2 million. To ensure his company kept and expanded its business with the Detroit pension funds, Mayfield paid bribes and kickbacks at Beasley's direction, including: (1) a stay at the Ballentyne Resort in Charlotte, North Carolina for Beasley, Mayor Kilpatrick, and their friends; (2) a $67,000 three-day golf trip to Las Vegas on a private jet for Beasley, Mayor Kilpatrick, and friends, along with Vegas shows, massages, and suites; (3) a $23,000 private jet flight to Tallahassee, Florida for Mayor Kilpatrick, his sons, and Beasley's son at the request of Beasley; (4) a job for Beasley's mistress at Beasley's request; (5) a $30,000 donation to the Kilpatrick Civic Fund; and (6) a $34,000 private jet flight to Bermuda for Mayor Kilpatrick and his wife, which Beasley was originally scheduled to go on with his wife.

Beasley received bribes and kickbacks from Roy Dixon whose private-equity company received $20 million in pension money from Detroit's two pension systems. Dixon's bribes and kickbacks to Beasley included: (1) a luxury trip for Beasley and his family to the Turks and Caicos, including six nights in a four-bedroom, 3,000 square foot villa, with golfing and gambling, and $2,000 in cash for airline tickets—all totaling about $13,000; (2) $20,000 to the Kilpatrick Civic Fund at Beasley's request; (3) a Christmas basket with $1,500 in cash; (4) a book with $1,500 in cash; and (5) $2,000 in cash for entertainment during pension trips.

Ronald Zajac, general counsel for the pension systems, hosted a birthday party for Beasley in 2007. Zajac told guests to bring cash. Zajac collected the money and gave $9,000 in cash to Beasley. In return, Beasley supported raising Zajac's salary. Zajac received more than $468,000 in excess salary from the end of 2007 until he was terminated by the boards.

Beasley received approximately $20,000 in cash from Marc Cunningham in connection with the Syncom deal, wherein Syncom received $30 million in investment money from the Detroit pension funds.

During the course of the conspiracy, at least $7.9 million in pension fund money was received by persons who paid bribes or kickbacks to Beasley and his co-conspirators as part of the conspiracy to deprive the participants and beneficiaries of their right to honest services of the trustees. The things of value that Beasley personally received or was to receive in the conspiracy was approximately $400,000. This figure includes cash, other things of value, trips for Beasley, and some of the Mayfield Gentry travel.

## Procedural Background

This Court originally sentenced Beasley to 132 months in prison, to be followed by three years of supervised release. (ECF No. 515, PageID.9021, 9023). Beasley was also ordered to pay $400,000 in restitution to the City of Detroit's

pension systems. (ECF No. 576, PageID.10754). He currently owes approximately $396,798.91 on that original $400,000 restitution judgment.

Beasley began serving his custodial sentence on January 16, 2016. (ECF No. 615, PageID.1128). After serving less than five years in custody, Beasley was released in November 2020, during the COVID-19 pandemic, to home confinement. (*Id.*) In late 2023, following amendments to the sentencing guidelines, which were made retroactive by the U.S. Sentencing Commission, the Court reduced Beasley's sentence to time served. (ECF No. 614). In February 2024, Beasley began serving his three-year term of supervised release. (ECF No. 615, PageID.1128).

Beasley has served approximately 18-months of his 3-year term of supervised release. (*Id.*) He has approximately 18-months left. Beasley lives in Tallahassee, Florida, and has been supervised by the probation department in the Northern District of Florida.

## Argument

The Court should deny Beasley's motion to terminate his supervised release early, and, pursuant to 18 U.S.C. § 3605, the Court should order the transfer of jurisdiction of Beasley's supervision to the Northern District of Florida, which is the District where he is being supervised.

After a defendant has served at least one year of a term of supervised release, a court may—but need not—order early termination of supervised release, "if it is

satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). A motion seeking early termination of supervised release appeals to the Court's discretion, and the Court is free to "consider a wide range of circumstances when determining whether to grant early termination." *United States v. Hale*, 127 F.4th 638, 640 (6th Cir. 2025). The Court, however, must consider certain factors set forth in 18 U.S.C. § 3553(a) in assessing whether both the defendant's conduct and the interest of justice support early termination. *United States v. Tavarez*, 141 F.4th 750, 758 (6th Cir. 2025). Specifically the Court must consider: the nature and circumstances of the offense and history of the defendant, the need for the sentence to provide adequate deterrence, the need to protect the public from further crimes of the defendant, the need to provide the defendant with needed educational or vocational training or other services, the range of sentences provided by the applicable sentencing guideline calculations, policy statements issued by the U.S. Sentencing Commission, the need to avoid sentencing disparities, and considerations of restitution. 18 U.S.C. §§ 3583(a), 3553(a). Early termination of supervised release is appropriate only when, after evaluating those factors, the Court concludes that early termination is warranted both by the defendant's conduct and also by the interest of justice. Beasley has not met that standard here.

Beasley claims that, to date, he has complied with the terms of his supervision and that he does not need supervision. (ECF No.615, PageID.11228–11229). Although "exceptionally good behavior" is not an "absolute prerequisite to relief," the expectation is that "district courts will generally find early termination proper only when exceptionally good conduct or other changed circumstances are present." *Hale*, 127 F.4th at 641 (internal quotation marks and citation omitted). That is because "compliance with all conditions is expected of an individual on supervised release, . . . and non-compliance is a ground for revocation[.]" *Id.* (internal quotation marks and citations omitted). Here, Beasley's satisfactory conduct while on supervised release does not warrant early termination. Like most defendants, he has done nothing more than what the Court's conditions require of him. And those requirements are not particularly strenuous as to him.

The nature and circumstances of Beasley's offenses along with his history and characteristics weigh against early termination of supervised release. Beasley betrayed the trust of thousands of pensioners and employees who counted on him to grow and protect their pensions and to secure their futures. Beasley could have used his intelligence, financial knowledge, and leadership to serve those pensioners. But instead, he used his position to corruptly make money for himself at the expense of those pensioners. When trusted to make decisions in the best interests of pensioners, Beasley showed his true colors. Specifically, he showed that he cannot be trusted.

Yet now he wants this Court to trust that he will continue to make restitution and will stay out of trouble after only 18 months on supervision. His offenses make clear that he should not be trusted. Continued supervision is not punishment; it is a way for the Court to trust but verify. 18 more months on supervision is a reasonable period for the Court to require of Beasley to show that he can be trusted to do what is required of him and stay out of trouble.

In terms of his personal characteristics, Beasley's intelligence and education set him apart from others. Beasley earned both an undergraduate and graduate degree in business administration. (PSR ¶ 98). It is positive that he obtained those degrees and that he has maintained employment during his supervision. (ECF No. 615, PageID.11228). But for someone with his education, experience, and innate intelligence, maintaining employment is to be expected. In addition, a sense of entitlement shines through in his motion. For example, while highlight that he is working for his "alma mater" and that all his children are "graduates" of his alma mater (ECF No. 615, PageID.11228), Beasley's motion makes no mention of helping anyone else at that institution. Elsewhere, he asserts that "*[h]e* has remained married…", which seems to downplay or ignore his spouse's decision. (ECF No. 615, PageID.11228) (emphasis added). That sense of self-entitlement is a characteristic that fueled his crimes. It appears that sense of entitlement has not gone away, and it weighs against ending supervision early.

Page **9** of **14**

The need to deter criminal conduct and protect the public weighs against ending supervision early. Beasley committed very serious crimes. A three-year term of supervision is fitting for the serious nature of his crimes. (PSR ¶ 112). Beasley has not made any argument that any of his conditions are onerous or that any of the conditions interferes with his ability to maintain employment. In fact, he conceded that he has "minimal special conditions." (ECF No. 615, PageID.11229). Beasley wants supervision to end simply because he feels he does not need supervision. That is not a good reason to grant early termination. More is required.

Supervision serves as an important deterrent and affords the public a degree of protection. While he is on supervision, Beasley knows, for example, that he must make his restitution payments, and that if he fails to do so, potentially he could return to custody. Thus, supervision provides structure and incentive for Beasley to continue to comply with the conditions imposed. If Beasley had made full restitution or had gone above and beyond in making restitution payments, the circumstances might be different. But they are not. The fact that Beasley has not made greater progress toward meeting his restitution obligation should give this Court pause about ending supervision early.

Beasley maintains that he does not need any programing or counseling. (ECF No. 615, PageID.11229). But perhaps programming or counsel would be useful. As noted, Beasley owes over $396,000 in restitution. In his 18 months on supervision,

he has paid less than $4,000 in restitution. He has a long way to go to meet his monetary obligation. Casting off programing and counseling is consistent with a sense of self-entitlement, not someone who is eager to make good on what they owe.

The sentencing guidelines range weighs against early termination too. Beasley received a substantial break on his term of imprisonment, in being released to home confinement after only five years in custody. Beasley does not deserve a break on supervision. The policy statements issued by the U.S. Sentencing Commission discuss early termination for abusers of controlled substances who, while on supervised release, successfully complete a treatment program. But that is not Beasley. He has completed half of his period of supervision. He has 18-months on supervision remaining. He does not have a lengthy term of supervision. He should complete the term this Court imposed.

Terminating Beasley's supervision would create, rather than avoid, unwarranted sentencing disparities. Defendants are routinely required to serve their term of supervision. *See United States v. Longerbeam*, 199 F. Supp. 3d 1, 3 (D.D.C. 2016) (denying a request to terminate a ten-year term four years early, despite six years of "law-abiding conduct and personal successes," as "such activities are expected of a person on supervised release and do not amount to 'exceptionally good behavior' or 'something of an unusual or extraordinary nature in addition to full compliance.'"); *see also United States v. Laughton*, 658 F.Supp.3d 540, 544 (E.D.

Mich. 2023) ("If 'unblemished' post release conduct warranted termination of supervised release, then "'the exception would swallow the rule,' i.e., diligent service of the full period of supervised release imposed at sentencing.") (internal citations omitted); *United States v Barnes*, No. 19-20216, ECF No. 579 (E.D. Mich. Feb. 17, 2023) (Roberts, J.) (denying early termination of supervised release where defendant's conduct was "commendable" but did not "offer anything that compels early termination"). Beasley's situation is not so unusual or different that requiring him to serve the remaining time—18 months—creates an unwarranted disparity.

Finally, as noted throughout, Beasley has not fulfilled his restitution obligation. He says he has made "progressive strides toward payment of his restitution obligation," but he ignores that he has only paid less than $4,000 in restitution. (ECF No. 615, PageID.11229). Beasley should not be rewarded for doing the bare minimum. When it comes to restitution, the interest of justice in this case requires more than the bare minimum in restitution payments. Beasley can do more, and he should do more to meet his restitution obligations. Having failed to do more, he should not be rewarded with terminating his supervision early.

The relevant 3553(a) factors weigh against early termination. The defendant has complied with his conditions of supervision and his conduct has been consistent with baseline expectations for every defendant on supervision. That is unremarkable.

He has not shown that the interest of justice warrants early termination, as he still owes more than $396,000 in restitution. Supervision should continue.

Upon denying Beasley motion, this Court should transfer jurisdiction over Beasley's supervision to the Northern District of Florida, which is where Beasley is being supervised. Based on his performance moving forward, Beasley would be free to bring his motion for early termination in that District at the appropriate, which is the district where he lives.

## Conclusion

The Court should deny Beasley's motion to terminate his supervised release early. Pursuant to 18 U.S.C. § 3605, the Court should order the transfer of Beasley's supervision to the Northern District of Florida.

Respectfully submitted,

JEROME F. GORGON JR.
United States Attorney

*s/ Trevor Broad*
Trevor Broad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Trevor.Broad@usdoj.gov
(313) 226-0210

Dated: August 11, 2025

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 11, 2025, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to the attorneys of record.

*s/ Trevor Broad*
Trevor Broad
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Trevor.Broad@usdoj.gov
(313) 226-0210